No. 12,278.

GREATER SERVICE HOMEBUILDERS INVESTMENT ASSOCIATION
ET AL. *v.* ALBRIGHT.
(293 Pac. 345)

Decided November 3, 1930. Rehearing denied November 24, 1930.

Mr. FRED S. CALDWELL, for plaintiffs in error.

Mr. WAYNE C. WILLIAMS, for defendant in error.

*En Banc.*

Mr. Justice Burke delivered the opinion of the court.

These parties appeared in reverse order in the trial court and for convenience we hereinafter designate them as there, or by name.

On a cause of action for $1,000 had and received plaintiff obtained a verdict for that amount. To review the judgment thereupon entered, defendants prosecute this writ, and maintain they were entitled to judgment on a special contract.

The complaint contained three causes of action. The first alleged that defendants received from plaintiff $1,000 which they had failed to pay on demand; the second that plaintiff bought of defendants for $1,000 a contract to build a home for $6,000, which contract was withheld for two years, was only delivered when she demanded the return of her money, and as delivered was ambiguous and unintelligible; the third, that plaintiff paid defendants $1,000 on their oral agreement to build her a house for $6,000, and furnish her a written contract to that effect, which contract they failed for two years to furnish, and which house they did not build, but in lieu thereof built one for $8,000. Each of said causes pleads the same transaction.

Defendants demurred to the complaint as a whole for ambiguity. As a whole it was perfectly lucid and the demurrer was properly overruled. They also demurred to the second and third causes for want of facts. These demurrers were sustained; why is not clear. Plaintiff then elected to stand on her first cause of action and defendants filed a general denial. Thus defendants selected the issue which they now maintain was a false one, and demurred out of the case the question of the contract on which they rest their right to benefits received and their hope of benefits to come. Further comment on their anomalous position is unnecessary. Their counsel

in his reply brief says: "If instead of proving or tending to prove *indebitatus assumpsit* the evidence proves that the money which it is claimed the defendant 'had and received' from the plaintiff was paid to them by the plaintiff pursuant to the express terms and provisions of an express written agreement * * * which said special contract is still open and unexecuted then the action on the common count for money had and received fails and judgment must, as a matter of law, be for defendants."

We accept this statement for the purposes of this decision and thus come at once to the important question, and the only one of moment, in the case, i. e., was there a written contract? The thing thus dignified is in evidence in the form of three documents which we will refer to as Exhibits N, M, and 1, all introduced without objection, and we here present them.

### Exhibit N.

"Application for the Home Contract
of
The Greater Service Homebuilders Investment
Association.

"1. Whereas, the Greater Service Homebuilders Investment Association, a common law trust of Chicago, Illinois, with a branch office at Denver, Colorado, is issuing its certain home contract, in form as follows, to-wit:

"2. This is to certify, That Dora Leah Albright of Skidmore County of Midaway State of Missouri has purchased the Home Contract hereinafter called Contract issued by the Greater Service Homebuilders Investment Association hereinafter called 'Association,' subject to Declaration of Trust creating said Trust Estate dated November seventh, A. D. 1921, and recorded in the Trustee's Office at Chicago, Illinois, or such other place or places as designated by the Board of Trustees of the Association which is hereby referred to and made a part hereof.

"3. This Contract is sold to the purchaser in accordance with the articles of agreement, covenants, notes, contractional agreements, shares or contracts, the application of the purchaser, and the conditions written and printed herein, also the by-laws of the Association, which are made a part of this contract, by reference, as fully as if written in each contract.

"4. When the purchaser buys a home of the Association, then at that time the purchaser is required to purchase from the Association the dividend participating investment coupon certificate, according to the purchase price of the home.

"5. The Greater Service Homebuilders Investment Association agree to build, or buy a home within Four months from date of this Contract, and sell same to the purchaser for Six Thousand Dollars ($6000.00) payable in two hundred (200) months from date of purchase, with interest at seven per cent (7%) per annum for two hundred (200) months'. time, total amount of interest Seven Thousand Dollars ($7000.00) payable at Seventy-one and 23/100 Dollars ($71.23) per month for two hundred (200) months from the time the purchaser buys the home, but the payments may be made annually or monthly as stated in the deed or in the contract for deed to be issued to the purchaser at the time he buys the home.

## "Payments

"6. When the purchaser of this Contract has paid to the Association one-third of the purchase price of the home as stated herein above Two Thousand Dollars ($2000.00) to be credited on the interest on the home to be purchased from the Association in Four months; the one-third to be paid in annual payments of............ Dollars ($........) payable in advance on or before the ........day of............192..., and every year thereafter until paid, at the home office of the Association in Chicago, Illinois, or to an authorized agent of the As-

sociation upon delivery of a receipt signed by the Secretary of the Association; but the payments may be made monthly of Two Hundred Fifty Dollars ($250.00) due on the 5 day of every month for Four months or until paid in full.

"7. If the purchaser pays the payments on the one-third as shown herein above, when due, then and in that event the Association will give the purchaser a credit of One Thousand Dollars at the end of four months ($1000.00) to help the purchaser to get the home in the number of months as stated herein above.

"8. If the purchaser does not want a home at the time he gets the required amount paid, he may have the amount he has paid to the Association in cash, credited on one of the dividend participating investment coupon certificates or he may sell the Contract.

"General Provisions

"9. The Association will not be responsible for payments sent through the mails unless same be made by bank draft, money order, or check, payable to the Association, or to a duly authorized agent, in exchange for a receipt signed by the Secretary and countersigned by said agent.

"10. Notice of each payment to be paid to the Association, is given and accepted by the delivery of this Contract.

"11. The purchaser of shares, or Contract, may at any time reduce his indebtedness by paying ten dollars ($10.00) or any multiple thereof.

"12. The Association shall have a lien on all Contracts and shares of the purchaser, to secure all debts due the Association until paid in full.

"13. Written notice of any change in the place of payment will be given the share or contract holders. Notice mailed to the last known address of the share or Contract holder, shall be deemed due notice as contem-

plated herein, with postage prepaid and deposited in the local postoffice.

"14. If the payments are not made when due they shall bear the legal rate of interest until paid. If not paid within sixty (60) days after said. payment is due, then all the unpaid balance evidenced herein, shall at once become due and payable; then or any time thereafter, the Association at its option may cancel this Contract.

"15. It is fully understood that neither the Trustees, Officers nor Beneficiaries shall be held to any personal liability under or by reason of this Contract. That the assets of the Trust Estate only shall be liable for any indebtedness, liability, wrongs, injury or tort incurred.

"16. This Contract may be transferred by paying the cost accrued thereby, provided the purchaser has fulfilled all the conditions as herein before stated, and said transfer is approved in writing by a Trustee or General Manager of the Association. No Transfer shall be valid or binding until all obligations have been paid, and said transfer is recorded on the books of the Association.

"17. Duplicate of the shares or Contract will be issued in place of those lost, by the owner making affidavit and giving satisfactory proof of such loss and paying the cost of issuing same.

"18. /The Association shall be bound and responsible for only such statements as are made in the application, shares, by-laws, notes, articles of agreement and covenants, and no one has authority to bind the Association to anything not contained therein.

"19. In witness whereof, the Greater Service Homebuilders Investment Association has caused this Contract to be executed at its Home Office in Chicago, Illinois, or such other place or places, as designated by the Board of Trustees of the Association.

"20. Issued this 5 day of March, 1925.

"21. Now, therefore, I, Dora Leah Albright, of Skid-

152

. more, Missouri, being desirous of obtaining one of said Home Contracts from said the Greater Service Homebuilders Investment Association, do hereby make application for the same through the Golden Rule Investment Trust on the basis of an estimated cost of Six Thousand dollars for the home to be provided pursuant to the terms of said contract.

"22. For and in consideration of its services in procuring said Home Contract, the undersigned applicant hereby promises and agrees to pay said the Golden Rule Investment Trust the sum of Eighty dollars.

"23. Made, executed and delivered this 5 day of March, A. D. 1925.

"(Signed)   Dora Leah Albright,
"Witness M. Gould.                    Applicant."

### Exhibit M.

"$2000.00            Denver, Colorado, March 5, 1925.

For value received, I, we, or either of us, jointly and severally, waiving grace and protest, promise to pay to the order of the Greater Service Homebuilders Investment Association (Operating under a Declaration of Trust) two thousand dollars, for the Home Contract. Payable as follows:

"Two Hundred fifty and no/100 Dollars, payable on the Fifth day of March, 1925, and the same day of every month thereafter, until the amount is paid in full. If the payments are not paid when due, they shall bear interest at the highest contract rate allowed by law per annum, until paid in full. If not paid within sixty days after said payments are due, then all the unpaid balance evidenced herein shall at once become due and payable, and thereupon the Greater Service Homebuilders Investment Association, may, at its option, cancel the contract, in consideration for the release of the owner and holder of the contract from all further liability on their note.

"Contract No. 612—13-M.

"P. O. Skidmore, Mo.

"Residence.........................

            "(Signed)   Dora Leah Albright."

On the back whereof the following indorsements appear:

| | | | |
|---|---|---|---|
| "3/20/25 | By Pymt. | 250.00 | |
| 5/1/25 | " | " | 250.00 |
| 5/8/25 | " | " | 250.00 |
| 6/6/25 | " | " | 250.00" |

### Exhibit 1.

This is a duplicate of Exhibit N, beginning with paragraph 2 thereof and extending to and including paragraph 20, following which it is signed "The Greater Service Homebuilders Investment Association, H. H. Gould, President, M. M. Gould, Secretary," and bears the seal of the Association save that in paragraph 5 of this Exhibit the price reads "An estimated price of $6000," and in the same paragraph the payments are specified to be "payable at $854.76 per annum."

The numbers of the paragraphs of Exhibit N do not appear in the original. We have inserted them for convenience.

Borrowing a rule of evidence from the law of negligence we might dispose of this contract with the phrase "res ipsa loquitur." It certainly speaks for itself. So many of its paragraphs shout "sham and pretense" that its true character, as a mere instrument of deception to induce the ignorant or unwary to part with their money, is self-evident. We will, nevertheless, take a brief glance at some of the most glaring provisions which invalidate this "contract," and for that purpose we note first a few controlling legal principles.

■ A contract is an agreement "to do or not to do a particular thing." 2 Blackstone 442.

■ If essentials are unsettled, and no method of set-

tlement is agreed upon, there is no contract. 13 C. J., p. 264.

A written agreement to buy and sell property, which neither describes the property nor fixes the amount of it, will not support an action for failure to deliver. *McAllister Co. v. Eldora Co.*, 51 Colo. 91, 116 Pac. 1038.

If the writing leaves the agreement of the parties vague and indefinite as to an essential element thereof, it is no contract, and cannot be made one by parol. *United Press v. N. Y. Press Co.*, 164 N. Y. 406, 58 N. E. 527, 53 L. R. A. 288.

If subject matter and consideration be not clearly defined, a contract is void for indefiniteness; and if so, payments made thereon will not validate it. *Briggs v. Morris*, 244 Pa. 139, 90 Atl. 532.

If this alleged contract was intended as an agreement "to do a particular thing," no man, from the documents, can ascertain the thing. It purports to concern the purchase and sale of a house, but whether the house is of one room or one hundred, whether it is built of straw or stone, whether it stands on a lot or a section, whether it is located in Denver or Dublin, are mere matters for conjecture. Not only are these essentials unsettled, but no hint of a method of settlement can be gleaned from the writing. Parol evidence may explain ambiguities, but cannot create a written contract. Payments made on a blank paper are equally impotent.

In paragraph 2 of Exhibit N, a "declaration of trust," and in paragraph 3 thereof, certain "articles of agreement, covenants, notes," and "contractional agreements," whose parties and contents are left as secret as the ancient mysteries and whose location as indefinite as the realm of Prester John, are made a part of this "contract."

In paragraph 6 of the same exhibit we find a provision for the payment of $2,000 in four months at $250 per month. Here is a problem in mathematics which would stagger Pythagoras.

Paragraph 4 of said exhibit might be interpreted to mean that the "Dividend Participating Investment Coupon Certificate" was a mere document evidencing the fact of the purchase of a home. Even there, however, the home and the certificate are mentioned as separate purchases, and paragraph 8 contains an option which supports this theory. If this be the correct one, and the "certificate" is to cost as much as the home (which is apparently the intention of paragraph 4), then plaintiff's principal liability, which she was led in the first instance to believe was limited to $6,000, has now grown to $16,000, and to this may be added $14,000 in interest.

Paragraph 15 appears to be a license to the officers of the company to commit almost any conceivable wrong or outrage in connection with the contract or the subject thereof and escape liability, relegating plaintiff for redress to that elusive thing denominated "trust estate." Since all contracts to commit crimes and torts are illegal, and all contracts to relieve one of damages arising from his crimes, and some of his torts, are equally so, this paragraph comes within the prohibition. 6 R. C. L., p. 715, §123, p. 725, §130, p. 727, §132.

In paragraph 21 we are apprised of the fact that the agent negotiating this "contract," and entitled to a commission for that valuable service, is "The Golden Rule Investment Trust," but this mythical creature appears nowhere in those negotiations, by itself, its officers, or agents, and the evidence gives us no clew to its identity or habitat. If it actually performed the service thus accredited to it, it must be an alias for H. H. Gould, president of the association, with the equally dazzling title.

But one further observation seems appropriate. These exhibits, and many others, went to the jury without objection, and but one objection was made, and that a futile and unimportant one, to the instructions. Every question of fact involved in this transaction was therefore submitted to a jury with defendants' approval, and by it found against them.

■ The conclusion is inevitable that there was no written contract and that defendants had not substantially performed any agreement which they had made, either orally or in writing. Hence they were indebted to plaintiff for her money had and received.

The judgment is accordingly affirmed.

MR. CHIEF JUSTICE WHITFORD and MR. JUSTICE CAMPBELL not participating.

MR. JUSTICE ADAMS sitting for MR. CHIEF JUSTICE WHITFORD.