## No. 15,281.

MESTAS *v.* MARTINI ET AL.

(155 P. [2d] 161)

Decided December 26, 1944.

Mr. ROMILLY FOOTE, for plaintiff in error.

Mr. ANGELO F. MOSCO, for defendants in error.

*En Banc.*

MR. JUSTICE ALTER delivered the opinion of the court.

THIS action was begun in the district court to compel the specific performance of a contract which the plaintiffs alleged was entered into between them and the defendant, and for certain injunctive relief.

The district court entered its judgment and decree in favor of the plaintiffs, to review which, defendant prosecutes this writ of error. The plaintiffs are Carmela Martini, Harold Ralya, J. M. Jaramillo, Joe Galvan, Emilia Valdez, Joe Martinez, Onofre Romero, Porfiria Martinez, Mrs. Arasimo Balardeta, and Basilio Tenorio, and the defendant is Felix B. Mestas, and the parties will be referred to herein as plaintiffs and defendant as that position was occupied by them in the district court.

The complaint alleged, and the answer admitted, that the plaintiffs, or in some instances their near relatives, were the owners of houses located in the west half (W½) of the southeast quarter (SE¼) and the northeast quarter (NE¼) of the southeast quarter (SE¼) of section eighteen (18) in township twenty-eight (28) south of range sixty-six (66) west of the sixth principal meridian, in Huerfano county, Colorado, at a location referred to as Mutual Camp. The property herein referred to, together with other property, was owned jointly by the Inland Real Estate Company and one P. F. Sharp, doing business as P. F. Sharp and Company. The interest of the Inland Real Estate Company was sold

for nonpayment of taxes on December 15, 1934, and was stricken off to Huerfano county, which became the owner of the tax sale certificate. The interest of Sharp was sold on December 21, 1935, for nonpayment of taxes, and the property was stricken off to Huerfano county, which became the owner of the tax sale certificate. On May 9, 1938, the two tax sale certificates were regularly assigned to defendant. Treasurer's deeds were issued to defendant, conveying the Inland and Sharp property, upon part of which Mutual Camp was located, on April 6, 1939, and defendant also secured deeds from the Inland Real Estate Company and the heirs of P. F. Sharp, so that at the time the complaint was filed defendant was the owner of the property in question by virtue of treasurer's deeds and deeds from the fee owners.

The complaint alleged, and the answer admitted, that on December 28, 1938, a meeting was held in Mutual Camp, at which the plaintiffs, or in some instances their near relatives, and others attended, and at which meeting defendant's interest in the property upon which Mutual Camp was located was discussed. Plaintiffs contend that it was at this meeting that the contract with defendant was consummated. The plaintiffs alleged that at this December 28, 1938, meeting their attendance was procured by defendant, and, upon attending the meeting, the defendant stated to those present that he had purchased the land on which their houses were located and would obtain title thereto by April, 1939. There were fifteen house owners in Mutual Camp, and defendant stated that the aggregate cost of obtaining title to the property upon which Camp Mutual was located would not exceed $450.00, and that he would expect, in addition thereto, ten per cent of the $450.00 for his labor, profit and trouble in securing title. Defendant further represented that he would have the land upon which Camp Mutual was located surveyed into lots of reasonable and convenient sizes and would execute

deeds to the respective house owners upon the payment of their pro rata share of the sum of $450.00 plus ten per cent. Defendant further stated that in order to help defray his expenses in acquiring title he would charge a rental of $1.00 to $1.50 a month, beginning January 1, 1939, until April, 1939.

It is alleged that plaintiffs agreed to and accepted the offer of defendant and have paid rent in accordance with the terms stated by defendant.

The complaint further alleged that defendant was formerly county assessor of Huerfano county, and thereby had acquired knowledge of tax matters, and the plaintiffs were inexperienced and wholly unfamiliar with such matters and so reposed confidence in the integrity and representations of the defendant and his proffered assistance in helping them by obtaining title to the lots upon which their houses were located, and by reason of the confidence reposed in defendant, plaintiffs failed and neglected to negotiate with the owners of the property upon which their houses were located for the purpose of obtaining title thereto in themselves, and thereby defendant obtained title to the property without any interference by plaintiffs.

The complaint further alleged that subsequent to obtaining title by the treasurer's deed, and deeds from the fee owners, defendant demanded from plaintiffs the payment of sums varying from $125.00 to $250.00 for lots upon which their houses were located and that this sum was greatly in excess of the reasonable value thereof and that defendant refused to convey title to the lots in accordance with the agreement made, entered into and accepted on December 28, 1938.

The defendant filed a general demurrer to the complaint, which was subsequently overruled, and thereupon filed his answer, in which pleading a demurrer was contained.

Defendant's answer contained, among other things, denial of the plaintiffs' allegations respecting his state-

ments at the meeting of December 28, 1938, and alleged that at this meeting he notified those present that he was attempting to acquire title to the real estate upon which their houses were located, and further stated that when title to this property was acquired he would have the same surveyed into lots of convenient size, and upon acquiring title and completing his survey, he would sell lots to those house owners who wished to purchase lots for a reasonable sum. Defendant specifically denied that at this meeting he stated to plaintiffs and others there assembled that the aggregate cost of their lots would be $450.00 plus ten per cent and denied that there was any discussion or promise whatever concerning the price at which he would agree to convey lots in Camp Mutual. Defendant specifically denied that there was any offer made by him to plaintiffs to convey any property in Camp Mutual for any specified sum whatever, and, consequently, there could be no acceptance, either written or oral.

Defendant further alleged that he expended $1,515.50 in acquiring title to the property described in treasurer's and other deeds and alleged that the house of Mrs. Arasimo Balardeta was located on property other than that owned by him; denied each and every other allegation contained in the complaint.

After various motions filed by plaintiffs, the rulings on which are not important here, plaintiffs filed their replication.

Trial to the court was had on November 14 and 15, 1941. During the trial plaintiffs J. M. Jaramillo and John Galvan, respectively, filed their written withdrawals, and upon order of court their withdrawals were permitted.

The court, on October 19, 1942, entered its judgment and decree in favor of plaintiffs and against defendant and in it specifically held that a valid, enforceable contract was entered into between the plaintiffs and defendant for the purchase of property at Camp Mutual

and that the same was not void under the provisions of the statute of frauds and that a tender of the purchase price by plaintiffs for their respective lots was unnecessary.

The court further found that on December 28, 1938, defendant agreed to convey to plaintiffs, for a total sum of $495.00, the lots on which their houses were located, and further agreed to deliver plaintiffs a good and sufficient deed therefor upon the payment by them of the purchase price. The judgment and decree further provided that each of the plaintiffs should pay to the clerk of the district court, within thirty days from the date of the decree, "* * * his equal share of the sum of $495.00, which shall be based on a division of said sum into eleven equal parts." and further provided that when the plaintiffs had deposited the sums mentioned "* * * the defendant shall forthwith deposit with the said clerk a good and sufficient warranty deed for the lots belonging to the respective plaintiffs so depositing," and that the clerk deliver the deeds to the respective plaintiffs, and for costs.

The court found, and so ordered, that a motion for a new trial was unnecessary.

Defendant prosecutes this writ of error to review the judgment of the district court and lists twenty-six specifications of error, which, for the purpose of this decision, may be classified generally as:

1. The contract between plaintiffs and defendant, if made as alleged, cannot be enforced in an action for specific performance. 2. Misjoinder of parties plaintiff. 3. No tender of the purchase price.

The crux of this case, as we view it, is the legal effect of the statements between the parties at the meeting of December 28, 1938, and the determination of this requires a summarization of the evidence.

The undisputed evidence is that plaintiffs are the owners of houses in Camp Mutual, which was apparently a settlement for the convenience of coal miners

and their families when coal mining was actively engaged in at or near this location. The real estate upon which the houses are located belongs to the defendant. Prior to December 28, 1938, some of the plaintiffs had interested themselves in the title to the real estate upon which their houses were located by going to the office of the county treasurer, and consulting one or more attorneys respecting the matter, with uncertain results. On December 28, 1938, the defendant caused a meeting to be held in Camp Mutual, at which it appears that the house owners in Camp Mutual were invited to be present and which meeting was attended by defendant. According to plaintiffs' witnesses, the defendant stated that he was acquiring title to the land upon which their houses were located and that upon perfecting his title he would have a survey made, and upon its completion would sell the lots upon which the respective house owners' houses were located for the sum of $450.00 plus ten per cent thereof to pay him for his trouble. Some of these witnesses testified that defendant stated that is was his desire to help the house owners in acquiring title to the real estate and that his only interest was in a right of way and that he might subsequently become interested in coal mining upon the property. All of plaintiffs' witnesses, except one, testified that defendant asked them to pay rent from January 1, 1939, to April 1, 1939, when defendant expected to perfect his title. Subsequent to this meeting of December 28, 1938, according to the testimony of one or more of plaintiffs' witnesses, there were efforts made by some of the house owners to acquire title to the real estate upon which Camp Mutual was located, other than through defendant, by making three or four trips to Pueblo and attending at the treasurer's office to see if they could pay taxes upon the land, but these efforts were unavailing.

The undisputed evidence discloses that one Rosendo Garibay represented defendant in collecting rents, and the following is a copy of one of the receipts issued to

house owners, and, except for house numbers, dates, the person making the payment, and the amount, all receipts issued by Garibay are identical.

"House
No. 2                                                    Jan. 1 1939
Received of Harold Ralya
One and 00/100 - - - - - - - - - - Dollars
For land rent
$1.00                                              F. B. Maestas"

The evidence is conclusive that on July 5, 1939, defendant properly acknowledged a plat of certain land in section eighteen (18) township twenty-eight (28) south range sixty-six (66) west of the sixth principal meridian, Huerfano county, which properly and legally described a plat of that section to be designated as Mutual Subdivision, and that this plat of Mutual Subdivision was filed in the office of the county clerk and recorder of Huerfano county, Colorado, on July 15, 1939.

Carmela Martini, one of the plaintiffs, resides in Pueblo, Colorado, and was not present at the meeting of December 28, 1938, but her father, Tony Martini, assumed to represent her at the meeting, and it was he who paid the monthly rental for his daughter.

Porfiria Martinez was the grandmother of Ophelia Martinez who was the owner of a house in Camp Mutual, Ophelia Martinez living in Denver. Porfiria Martinez was present at the meeting of December 28, 1938, and assumed to represent her granddaughter, although she is the one who is listed as a plaintiff and the one to whom the court directed a deed to be delivered by defendant. Porfiria Martinez testified that she knew nothing of defendant's offer to sell the property for $450.00.

Basilio Tenorio, one of the plaintiffs, did not testify, nor did anyone testify concerning his interest in securing title to any land in Camp Mutual.

Emilia Valdez, one of the plaintiffs, did not testify as a witness in the cause nor did any one offer any

testimony whatever concerning her interest in securing title to any land in Camp Mutual.

The plaintiffs offered no evidence respecting any contract with defendant except the statements made at the meeting on December 28, 1938. There is no evidence of any conversations in which it is claimed that defendant renewed or reiterated the offer which plaintiffs testified defendant made and which was by them accepted on that date.

The record disclosed that several of the house owners in Camp Mutual who were present at the meeting of December 28, 1938, testified that defendant made no offer to sell at any fixed price any land to which title was subsequently to be acquired and no one present at the meeting made any inquiries as to the price at which defendant might sell house owners any lands in Camp Mutual. Several witnesses so testifying subsequently purchased the lots upon which their houses were located and paid the defendant the price which he asked for them.

The undisputed evidence is that the contract upon which the plaintiffs rely was oral, and neither at the meeting of December 28, 1938, nor subsequent thereto, was the contract reduced to writing, and there is no evidence of any improvements made by any house owner on any portion of the property involved subsequent to the meeting of December 28, 1938.

1. The defendant maintains that the alleged contract upon which plaintiffs rely was, if made, in direct violation of the provisions of the statute of frauds, which reads: "No estate or interest in lands, other than leases for a term not exceeding one year, nor any trust or power over or concerning lands, or in any manner relating thereto, shall hereafter be created, granted, assigned, surrendered or declared, unless by act or operation of law, or by deed or conveyance in writing, subscribed by the party creating, granting, assigning, surrendering or declaring the same, or by his lawful

agent, thereunto authorized by writing." '35 C.S.A., vol. 3, c. 71, §6.

Under decisions of this and courts in other jurisdictions, the almost universal rule has been that an oral contract for the conveyance of lands or interests therein for terms exceeding one year were void unless, pursuant to the terms of the contract, there has been a part performance. Obviously it cannot be successfully maintained that there is a part performance of a contract until it has been definitely determined that there is a valid and enforceable contract in existence between the parties. In order to justify the specific performance of a parol contract for the sale of land on the ground of part performance, it is necessary that all the essential terms of the contract must first be established by competent evidence and shown to be definite, certain, clear, and unambiguous. An oral contract for the sale of land, to be enforced in a court of equity, must have that degree of certainty that would be required in written contracts sought to be specifically enforced.

"It is an elementary doctrine of the courts of equity that they will not specifically enforce any contract unless it be complete and certain. In the discussions of the present and next succeeding section, the element of completeness denotes that the contract embraces all the material terms; that of certainty denotes that each one of these terms is expressed in a sufficiently exact and definite manner. An incomplete contract, therefore, is one from which one or more material terms have been entirely omitted. An uncertain contract is one which may indeed embrace all the material terms, but one or more of them is expressed in so inexact, indefinite, or obscure language, that the intent of the parties cannot be sufficiently ascertained to enable a court to carry it into effect. The former of these qualities is the subject matter of the present section. This element of completeness must exist in every contract which can be specifically enforced, whatever be its external form,

whether written or verbal, whether embodied in the memorandum required by the statute of frauds, or rendered obligatory by part performance, or by any other mode which may obviate the prohibitions of that statute. It should be observed, however, that the completeness here spoken of, although quite analogous to, is really more extensive and embracing more particulars than that which, we have seen, must be found in the note or memorandum of the agreement mentioned in the statute of frauds, since it must extend to the entire contract. In order that any agreement, whether covered by the statute or not, whether written or verbal, may be specifically enforced, it must be complete in all its parts; that is, all the terms which the parties have adopted, as portions of their contract, must be finally . and definitely settled, and none must be left to be determined by future negotiation; and this is true without any regard to the comparative importance or unimportance of these several terms. * * *'' Pomeroy's Specific Performance of Contracts (3d ed.), pp. 376-378, §145.

"* * * the quality of certainty now to be considered denotes that the contract not only contains all the material terms, but that each one of them is expressed in a sufficiently exact and definite manner. An uncertain contract, therefore, may perhaps embrace, in a partial manner, all the material terms, but on account of the inexact, indefinite, or obscure language in which one or more of them is stated, it fails to express the intent of the parties with sufficient clearness to enable the court of equity to enforce its provisions. The specific performance of an agreement, thus uncertain, will not be decreed. No criterion can be formulated which shall be a test of certainty in every instance. As a general proposition, although it is perhaps too vague to be of much practical use, the terms of a contract must be expressed with a reasonable certainty, and what is reasonable in any case must depend upon the subject mat-

ter of the agreement, the purpose for which it was entered into, the situation and relations of the parties, and the circumstances under which it was made. *A greater amount or degree of certainly [certainty] is required* in the terms of an agreement, which is to be specifically executed in equity, than is necessary in a contract which is to be the basis of an action at law for damages. An action at law is founded upon the mere nonperformance by the defendant, and this negative conclusion can often be established without determining all the terms of the agreement with exactness. The suit in equity is wholly an affirmative proceeding. The mere fact of nonperformance is not enough; its object is to procure a performance by the defendant, and this demands a clear, definite, and precise understanding of all the terms; they must be exactly ascertained before their performance can be enforced. * * *" Pomeroy's Specific Performance of Contracts (3d ed.), pp. 402-407, §159.

"It is an established rule in equity that specific performance will not be decreed of an agreement for sale, whether verbal or written, unless the property to be conveyed is fixed with certainty as to the locality and description of the land, or in such way that it can be ascertained with certainty. * * *" Waterman on the Specific Performance of Contracts, p. 203, §154.

"A plaintiff seeking specific performance of an oral agreement affected by the statute (of frauds) must be able to show clearly not only the terms of the contract, but also such acts and conduct of the defendant as the court would hold to amount to a representation that he proposed to stand by his agreement and not avail himself of the statute (of frauds) to escape its performance; and also that the plaintiff, in reliance of this representation, has proceeded, either in performance or pursuance of his contract, to so far alter his position as to incur 'an unjust and unconscientious injury and loss, in case the defendant is permitted after

all to rely upon the statutory defense.' After proof of this, the court may well be justified in using its undoubted power, in cases of equitable estoppel, to refuse to listen to a defendant seeking to deny the truth of his own representations previously made." Browne, Statute of Frauds (5th ed.), p. 585, §457a.

"Where the contract is one which is required by the statute of frauds to be in writing, and is wholly executory, equity will not against the objection to the oral character of the contract decree its specific performance unless the circumstances are such that the defendant's refusal to execute the contract would itself amount to the practice of fraud on the plaintiff, as is often the case when there have been acts of part performance by one party to an oral contract in reliance upon and referable to that contract. An action for specific performance is within the operation of the provision of the statute of frauds forbidding any civil action to be maintained upon stipulated agreements unless in writing. Under the equitable doctrine of part performance, however, recognized in most jurisdictions, a court of equity will, in order to prevent the use of the statute of frauds as an instrument or shield of fraud, decree the specific performance of an oral contract at the instance of the party thereto who in reliance upon that contract, and pursuant thereto has partly performed it, notwithstanding it is of the class of contracts required by the statute of frauds to be in writing, provided the alleged oral contract is one which if in writing would be enforceable in equity. *The contract must contain all the elements of a binding obligation necessary to the enforcement of any contract, except the written memorandum required by the statute, and must be admitted or proved by the requisite degree of proof, and it must appear that the plaintiff has no adequate remedy at law.* The theory of this equitable doctrine of part performance is that it would amount to a fraud on the party who, in reliance on the contract and pursuant thereto, has partly per-

formed it to permit the other party to refuse performance on his part. Nothing can be regarded as a part performance to take a contract out of the operation of the statute which does not place the party in a situation which is a fraud upon him unless the contract is enforced. * * *" (Italics ours) 49 Am. Jur., pp. 32-33, §21.

"In order for a court of equity to decree specific performance of a contract, the court must be able to determine what must be done to constitute performance. The indefiniteness of an agreement is an adequate reason for refusal to direct specific performance thereof. The contract itself must make the precise act which is to be done clearly ascertainable. It is fundamental that in order to do this and to enable the court to decree specific performance, the terms of the contract must be clear, definite, certain, and complete. The contract must be free from doubt, vagueness, and ambiguity, so as to leave nothing to conjecture or to be supplied by the court. It must be sufficiently certain and definite in its terms to leave no reasonable doubt as to what the parties intended, and no reasonable doubt of the specific thing equity is called upon to have performed, and it must be sufficiently certain as to its terms so that the court may enforce it as actually made by the parties. A greater degree of certainty is required for specific performance in equity than is necessary to establish a contract as the basis of an action at law for damages. Courts of law will grant relief in damages for the breach of many agreements which would not be regarded in equity as sufficiently definite and certain to warrant a decree for their specific performance, since an action at law is founded on mere nonperformance by the defendant, and this negative act may often be established without determining all the terms of the contract with exactness.

"Whenever it appears that material matters are not clear, certain, and complete, but are left by the parties so obscure or undefined that the court cannot say

whether or not the minds of the parties met upon all the essential particulars, or if they did, the court cannot say exactly upon what substantial terms they agreed, the case is not one for specific performance. Equity cannot make a new contract for the parties, but must enforce the contract according to its terms or not at all; the court will not make a contract for the parties or supply any material stipulation thereof. If a decree of specific performance should be entered in such a case, it would be uncertain whether the court was enforcing the contract the parties had agreed upon, or whether it was making a new agreement for them, and decreeing its execution.

\* \* \*

"The requirements of definiteness, certainty, and completeness have been held to be especially applicable to oral contracts for the sale of land which are sought to be specifically enforced on the ground of part performance. *Such contracts, it is said, must have at least that degree of certainty which is required of written contracts sought to be specifically enforced. The terms of such an oral contract must be so clear and complete as to allow no reasonable doubt respecting its enforcement according to the understanding of the parties.*" (Italics ours) 49 Am. Jur., pp. 34-36, §22.

"The remedy of specific performance presupposes the existence of a valid contract between the parties to the controversy, or between those through whom they claim, the contract being generally required to have the essentials of a contract valid and binding at law in order to be enforceable in equity. It must be a concluded contract; there must have been a clear mutual understanding and a positive assent on both sides as to the terms of the contract; it must be sufficiently definite and certain; the parties must have the capacity to contract; it must be on a valuable consideration; and it must not be illegal." 58 C.J., p. 849, § 4.

"To enable a court to decree specific performance of

an alleged contract there must be a valid, binding, and concluded or completed contract between the parties to the suit; the court cannot make a contract for the parties and then decree its specific performance, nor can it require the performance of any contract other than the one which the parties themselves have made. There must have been mutual assent and understanding, or a meeting of the minds of the parties, arrived at by a clear and explicit acceptance of a proper and unrevoked offer, and unaffected by fraud, duress, undue influence, or mistake. All the other essential elements of a valid executory contract, such as competent parties, a legal subject matter, and a valuable consideration, must be present before a court of equity will enforce specific performance. There must be mutuality of obligation, and all the material terms of the contract must be complete and reasonably certain, as well as fair, reasonable, just, and equitable. Where a contract belongs to a class capable of being specifically enforced, and the foregoing requirements are fulfilled, a court of equity may decree specific performance, and will do so where there is no ground or reason for refusing to make such a decree; but nevertheless it may refuse specific performance of a contract which is valid or which it would not, on the evidence, cancel or set aside; and even though a contract may be so drawn and construed as to permit a recovery in damages for its breach, it may be proper to withhold the remedy of specific performance." 58 C. J., pp. 929-930, §95.

The terms and conditions of an oral contract and the part performance thereof necessary to make it legal and enforceable, notwithstanding the statute of frauds, is fully discussed in an annotation in 101 A.L.R. 923, et seq.

We shall not attempt to make a factual statement in the following decisions from our own courts but shall content ourselves with quotations therefrom. "In every case where suit is brought to enforce the spe-

cific performance of a contract, the contract must be clear and established beyond question, and even then the granting or refusing of it rests largely in the discretion of the court. No general rule can be or has been adopted." *Sullivan v. Leer,* 2 Colo. App. 141, 142, 29 Pac. 817.

"Again, it is urged that the verbal agreement between plaintiff and defendant in respect to the land in controversy has been partly performed, and that thereby defendant has acquired an equity to have the agreement enforced by a decree of specific performance. *Acts of part performance, such as will furnish a foundation for enforcing a verbal contract respecting land otherwise void under the statute of frauds, must be such as are done in pursuance, or according to the terms, of the contract, and which in some manner affect or change the relation of the parties in respect to the property whereby one of the parties would be defrauded if the contract were not enforced.* 1 Story, Eq. Jur. §§759-766; 3 Pom. Eq. Jur. §1409; *Gill v. Newell,* 13 Minn. 462 (Gil. 430).

"Defendant claims that, by taking possession of the premises with the consent of plaintiff, there was a part performance of the verbal contract sufficient to entitle her to have the same specifically enforced. Actual possession in furtherance of the terms of the contract, especially when accompanied by the making of permanent and valuable improvements upon the premises, may be made the foundation for a decree for specific performance; but mere possession will not be deemed a part performance sufficient to justify such relief when it may fairly be referable to some other cause than the execution of the contract. In this case defendant did not make improvements or expend money upon the land. Besides, defendant's occupation of the premises cannot be said to have been according to the terms of the alleged verbal agreement, nor in furtherance of its ultimate objects as claimed by defendant." (Italics ours)

*Von Trotha v. Bamberger,* 15 Colo. 1, 12-13, 24 Pac. 883.

"The statute [statute of frauds] in question was passed for the reason that it was not safe to let proof, upon the questions therein referred to, rest in parol; it follows that to serve the purpose of the statute we must take care never so to extend the exceptions thereto, which are pressed upon us so constantly, as to let those questions become issues to be tried on oral testimony alone.

"While it has often been truly said that equity ought not to allow the statute of frauds to be used as an instrument of fraud or wrong, yet the statute can never be enforced without some hardship and wrong. Wherever there is an oral contract on which a party has relied, it is in some degree, a wrong and hardship upon him to hold it invalid, and if there is no oral contract there is no room for the statute to act; therefore the enforcement of the statute must always be, in a sense (though, of course, not in legal contemplation) a fraud or wrong upon him against whom it is enforced.

\* \* \*

"\* \* \* There are authorities which hold that taking possession and payment of rent constitute sufficient part performance, but this leaves all proof of the term of the lease to oral testimony and, in a great majority of cases, abrogates the statute. \* \* \*" *Knoff v. Grace,* 68 Colo. 527, 529, 530, 190 Pac. 526.

" 'The right of a party who has done acts in part execution of a verbal contract, to call upon a court of equity to enforce it against the other, is subject to the same general restrictions as that of any other plaintiff in equity \* \* \* It must \* \* \* appear that his position is such that an action at law for damages will not afford him adequate relief. And \* \* \* he must furnish clear and full proof of the contract, so that it may be enforced finally, and with due regard to the rights of all parties concerned.' Browne, Stat. Frauds (5th ed.), p. 576,

§452. 'Another general rule in regard to the acts relied upon is, that they must appear to have been done *in pursuance* of the contract alleged. * * * 'It must be such an act done, as appears to the court would not have been done, unless on account of the agreement' or * * * 'an act unequivocally referring to, and resulting from, the agreement'." Id., p. 577, §454. In *Von Trotha v. Bamberger,* 15 Colo. 1, 15, 24 Pac. 883, 888, this court said: 'Eminent counsel and distinguished jurists have battled ingeniously and vigorously for the last two hundred years with cases like this, endeavoring to secure relief under verbal contracts concerning land notwithstanding the statute of frauds and perjuries. At times they have well-nigh succeeded in repealing the statute, and have often illustrated the saying that "hard cases make bad precedents." Nevertheless, the statute has survived these attacks; and the tendency of modern decisions is to maintain its substantial provisions according to its true spirit and purpose, and not to indefinitely multiply exceptions thereto.' This tendency continues. The sections above cited from our statute of frauds have remained unchanged since their enactment in 1861 at the first session of our territorial legislature. We deem it our duty to preserve and enforce the statute as a most beneficent law, as important now as ever before. The equity powers expressly recognized therein must be exercised in accordance with the fundamental principles of equity procedure. The case at bar does not involve actual possession and permanent improvements in the usual sense. The building of the fence claimed as part performance was wholly on the Mitchell tract, and seems from the evidence to have been primarily and originally intended for the natural protection and adornment of such a place. The expenditures were trivial. 'The circumstances of the case, and the relations of the parties must be such that the loss of his improvements, resulting from a failure to complete the agreement, would be an actual sacrifice on the part of the pur-

chaser.' Pomeroy, Specific Performance of Contracts (3rd ed.), p. 329, §129. Even if the evidence had been clear and strong enough to impart life and validity to a contract invalid because verbal, the essential requirements for invoking equity are absent. In view of the foregoing, other serious questions raised by French need not be considered." *French v. Mitchell,* 92 Colo. 532, 534, 535, 22 P. (2d) 644.

"It seems to be a well settled rule with reference to suits for specific performance that the contract should not only contain all the material terms necessary to make a complete and legal contract, but that each one of the terms should be expressed in a sufficiently exact and definite manner that a court may, with reasonable certainty, enforce the specific performance of it. * * *" *Riverside Co. v. Sawyer,* 24 Colo. App. 442, 445, 446, 134 Pac. 1011.

From an examination of the authorities and a consideration of our own decisions, we conclude that even in those cases where a part performance of a contract has taken place, nevertheless an oral contract cannot be enforced in an action for specific performance unless it contains all the material terms necessary to make it a complete and legal contract, and each of the terms must be expressed in a sufficiently exact and definite manner so that the court may, with reasonable certainty, ascertain its exact terms and provisions and enter its decree accordingly.

We are convinced, from a consideration of the record in this case, that the statements of defendant, if made as some of plaintiffs' witnesses testify, at the meeting on December 28, 1938, did not, even if accepted by plaintiffs, amount to a valid, enforceable, legal contract for the sale of land. It is too indefinite and uncertain to be enforced; it lacks both mutuality and consideration.

Having reached the conclusion that the contract upon which plaintiffs rely is not a valid and enforceable contract, it necessarily follows that part performance

thereof, if made, could not strengthen plaintiffs' position. The court, therefore, committed reversible error in holding that the contract upon which this action is based could be enforced in an action of specific performance.

Since we have determined that reversible error was committed, it becomes unnecessary to determine other questions presented in the record.

The judgment and decree of the district court is reversed, and the cause remanded with instructions to enter judgment for defendant.