**ENGINEERED DATA PRODUCTS, INC., a Michigan corporation, Plaintiff,**

v.

**ART STYLE PRINTING, INC. d/b/a "Dataware," a Texas corporation, Defendant.**

**No. Civ.A. 96–K–2385.**

United States District Court, D. Colorado.

Nov. 16, 1999.

---

**17.** *See Bennett v. Spear,* 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281.

**18.** *See Greenpeace Action v. Franklin,* 14 F.3d 1324.

William E. Murane, Holland and Hart, LLP, Denver, CO, Gregg I. Anderson, Merchant, Gould, Smith, Edell, Welter & Schmidt, P.C., Denver, CO, for plaintiff.

Thomas H. Young, Reed Heimbecher, Dorsey & Whitney, LLP, Denver, CO, Walter R. Brookhart, Browning, Bushman, Anderson & Brookhart, Houston, TX, for defendant.

## MEMORANDUM OPINION DENYING APPEAL OF ORDER OF MAGISTRATE JUDGE DENYING MOTION TO ENFORCE SETTLEMENT

KANE, Senior District Judge.

This is the lead of four pending cases in this court involving claims of infringement of Plaintiff Engineered Data Products, Inc.'s ("EDP's") patents by Art Style Printing d/b/a/ Dataware ("Dataware") on computer-generated label printing systems. Judge Walker D. Miller recently recused himself from the cases which were then reassigned to me. Various motions are pending, including Defendant's motions for summary judgment; and Defendant's motion to stay pending resolution of proceedings in the U.S.Patent & Trademark Office. The first matter for consideration, however, is Plaintiff's appeal pursuant to 28 U.S.C. § 636(b)(1) of the July 1, 1999 Order of Magistrate Judge Abram denying EDP's Motion to Enforce Settlement ("Order").

### I. Background.

On October 10, 1996, EDP filed a Complaint in Patent Infringement and Jury Demand against Dataware. The parties had entered settlement discussions initially with counsel and the magistrate judge. The corporate executives were permitted to negotiate without counsel. EDP's Chief Executive Officer, Richard Benson, and Dataware's Vice President, Morgan Anderson, were the negotiators. The motion to enforce relates to an agreement embodied in an exchange of correspondence between EDP and Dataware culminating in a March 12, 1999 letter executed on behalf of both EDP and Dataware.

On January 6, 1999, Benson, representing EDP, sent a letter to Anderson making a settlement proposal for this lawsuit. The letter stated, *inter alia,* "The details of a formal agreement can be negotiated if we are able to reach agreement on the core elements" and "[t]he settlement would include a covenant not to sue having

the following terms...." There followed a nine element proposal. The letter concluded: "We look forward to further communication with you and Joe and your consideration of the above elements of a possible settlement."

Following an exchange of letters between the parties' respective counsel concerning the January 6, 1999 letter, Anderson, representing Dataware, responded in a letter dated February 23, 1999, setting forth alternative terms to elements 1 through 4 of EDP's proposal and stating: "We have no serious disagreement with items 5 through 9." Anderson's letter also said: "I am hopeful that you will give favorable consideration to our counter proposal so that we can move forward immediately to prepare a formal agreement."

On February 26, 1999, Benson on behalf of EDP wrote a nine element proposal to Anderson of Dataware, concluding: "We are looking forward to further communication with you and full resolution of the issues in the near future." On March 1, 1999, Anderson replied to Benson, thanking him for the quick response to the February 23, 1999 letter and making "our last attempt to finalize an agreement" by proposing alternative elements to items 1 and 4, while stating that items 2, 3 and 5 through 9 were acceptable.

On March 12, 1999, Benson of EDP wrote Anderson of Dataware stating: "Per our telephone conversation this week, the following are the key elements of our agreement not to sue:...." The letter then set forth nine elements. Element 6 included the wording of that element stated in Benson's February 26, 1999 letter, namely, "No authority of Dataware to grant any rights for the manufacture of labels or use of the process covered in the patent," but added, "(i.e. this agreement is non-transferable.)" The March 12, 1999 letter concluded: "I believe the above correctly describes the understanding we have reached. To that end would you please sign and return to me the enclosed copy of this letter, confirming our agree-

ment in principal [sic]. We can then instruct our respective lawyers to come up with a formal agreement." Benson signed the letter. Under Benson's signature appeared the words: "The foregoing correctly sets forth our agreement in principal [sic]," and Anderson signed on behalf of Dataware in the designated space thereunder.

Before Benson sent the March 12, 1999 letter on behalf of EDP, he had his counsel review the letter. Anderson signed it on behalf of Dataware before Dataware's counsel had reviewed it. The added words in parentheses to paragraph 6, "(i.e. this agreement is nontransferable)," led to a refusal by Dataware to sign the formal agreement prepared by counsel for EDP following signature of the March 12 letter by the parties.

After the parties had signed the letter, EDP's counsel undertook to prepare the "detailed agreement" contemplated in therein. The first draft of the "Confidential Royalty Agreement and Covenant Not to Sue" ("EDP's Draft Agreement"), an eleven page single spaced agreement, was forwarded to counsel for Dataware on March 19, 1999. EDP's Draft Agreement states the parties sought to resolve all matters in litigation under the terms and conditions set forth in EDP's Draft Agreement. No reference is made to the March 12 letter or an existing agreement. EDP's Draft Agreement interjects significant additional obligations and restrictions on Dataware not addressed in the March 12 letter nor the correspondence preceding it. The added provisions address essential matters, including the patents and claims covered by the settlement, the definition of net sales price upon which such royalties will be paid, the terms and conditions of timely payment, the termination of the agreement and warranties. In addition, Subsection 6.1 of EDP's Draft Agreement attempted to expand the limitation on sublicensing and transfer found in paragraph 6 of the March 12 letter, by stating the agreement would be terminated upon the

sale of stock or transfer of the assets of Dataware by its principals.

On March 26, 1999, Dataware forwarded its proposed changes to EDP's Draft Agreement to counsel for EDP. In an attempt to comply with the intention of the parties set forth in paragraph 6 of the March 12 letter, Dataware sought to remove the termination provision related to the sale of stock and transfer of assets contained in Subsection 6.1. On March 31, 1999, EDP's counsel forwarded EDP's Second Draft Agreement with a letter stating that Dataware's revisions to the limitations on transfer were unacceptable to EDP.

Paragraph 1 of the March 12, 1999 letter fixed the initial $20,000 payment by Dataware "at signing" and "$10,000 per quarter for ten quarters immediately following the signing." No money was requested or paid upon signature of the letter.

On April 6, 1999, after attempts at negotiating a formal agreement had failed, Benson of EDP wrote a letter to Anderson stating:

> I am disappointed that your efforts to renegotiate the non-transferability of rights in the agreement we reached has precluded our respective counsel from completing the process of filling in some of the details. Nevertheless, we have an agreement as set forth in our exchanges of correspondence and personal negotiations, culminating in the March 12, 1999, agreement in principle which you and I both signed.

The letter went on to state, pursuant to the March 12, 1999 agreement, Dataware now owed the first installment on the fixed royalty which should be remitted to EDP forthwith.

On April 13, 1999 EDP's Motion to Enforce Settlement was filed.

## II. *Order and Appeal*

Magistrate Judge Abram held a hearing on the motion to enforce settlement. Neither party provided live testimony. Both relied upon affidavits of Benson, Anderson and other individuals, including counsel for the parties, who had knowledge of the negotiations. In his Order, the magistrate judge found the correspondence between the parties, culminating in the March 12, 1999 letter contemplated that the contract would go into effect at the signing of a formal agreement and that, even if the intent of the parties was to have an agreement without a final document, there was not a meeting of the minds on an essential element of the settlement agreement, namely the phrase added in parentheses as part of element 6 of the March 12, 1999 letter. Accordingly, in his Order, Magistrate Judge Abram denied the motion to enforce settlement.

EDP appealed the Order, stating "[t]he central error in Magistrate Judge Abram's Order is his key assumption that the phrase in the March 12, 1999, letter prohibiting transfer '... was a zinger which was passed over without thought by Anderson when he signed the March 12, 1999 letter.'" (Order at 5.) EDP asserts there was no basis in evidence for this critical assumption nor any indication by affidavit or otherwise that Anderson did not read the March 12, 1999 letter before he signed it and that a party may not avoid the consequences of an agreement which he has signed. It further asserts the essential terms of the agreement were contained in the letters and, in these circumstances, the fact that the parties contemplated the later preparation and execution of a more formal document does not render a letter agreement unenforceable according to its terms. EDP maintains the efforts of counsel after the March 12, 1999 letter to draft a more formal document were irrelevant as the issue was whether the correspondence culminating in the March 12, 1999 letter, standing alone, constituted an agreement. *See I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882, 888 (Colo.1986) (holding "[t]he mere intention to reduce an oral or informal agreement to writing, or to a more formal writing, is not of itself sufficient to show that the parties intended that until such formal writing was execut-

ed the parol or informal contract should be without binding force"); *City & County of Denver v. Adolph Coors Co.,* 813 F.Supp. 1476, 1482 (D.Colo.1993) (supporting the proposition that even an unsigned settlement agreement may be enforced).

In responding to EDP's appeal, Dataware maintains the evidence of record supports the Order of the magistrate judge. It states the magistrate judge made two specific findings: (1) that the parties contemplated the contract to go into effect at the signing of the formal agreement; and (2) that there was no agreement or meeting of the minds of the parties to the new terms added by EDP to paragraph 6 of the proposed formal agreement. Dataware argues EDP has objected to the second finding but not the first. It states the first finding that the parties contemplated contracting only by a formal agreement (which was not concluded) fully supports the denial of the motion by Magistrate Judge Abram and that therefore I need not even address the second finding.

Dataware argues the intention of the parties in signing the March 12 letter was to enter a non-binding agreement in principle intended by them to facilitate the drafting of a formal, written agreement to settle this matter. *See New York Life Ins. Co. v. KN Energy,* 80 F.3d 405, 411 (10th Cir.1996); *Griffin v. Griffin,* 699 P.2d 407, 409 (Colo.1985) (en banc). In support, Dataware cites (1) the two places in the letter where the parties refer to it as an agreement in principle and (2) the fact that future actions, including the initial payment of royalty was premised on the signing of a formal agreement.

Dataware further asserts the magistrate judge correctly found that paragraph 6 of the March letter set forth an essential term to any agreement between the parties and that the parties had not agreed to a crucial element thereof. In this regard it attaches a supplemental affidavit of R. Morgan Anderson to the effect that the added parenthetical phrase "(i.e. this agreement is non-transferable"), first added by the EDP March 12, letter was nei-

ther noted nor mentioned in any of his negotiations with Benson, that he believes EDP purposely inserted the parenthetical phrase to slip in an undiscussed element, and that he did not understand or intend to agree to the newly inserted element.

In reply, EDP points out Anderson's supplemental affidavit does not dispute that he read the letter that he signed on March 12, reflecting the parties' agreement in principle and containing the phrase that the agreement was non-transferable. EDP appends a counter-affidavit of Benson to the effect that the matter of transferability was discussed in the final telephone negotiation of the covenant not to sue. It asserts Anderson does not deny that he signed a document which he had read. EDP iterates that Magistrate Judge Abram had nothing before him beyond the written submittals of the parties and the record remains devoid of any basis for the unfounded assumption of the Order that the non-transferability phrase was somehow covertly inserted in the March 12 letter. Nor, EDP argues, did the contemporaneous documentation by correspondence provide support for the finding that the parties contemplated the contract would only go into effect upon the signing of the formal agreement.

### III. *Standard of Review*

■ EDP asserts the standard of review of the Order of the magistrate judge is *de novo*. Dataware apparently concurs. The January 27, 1999 Order of Reference to Magistrate Judge designated Magistrate Judge Abram *inter alia* to hear and determine pretrial matters, *including* discovery and other non-dispositive motions. The order of reference did not designate the magistrate judge to submit recommendations for rulings on dispositive motions. Nevertheless, Judge Miller referred the motion to enforce settlement agreement, a dispositive motion, to Magistrate Judge Abram who conducted a hearing on the motion and issued the Order denying it on July 1, 1999. Because the motion to enforce settlement was of the nature of a

**1078**

dispositive motion, I treat the Order as a recommendation on a dispositive motion and pursuant to 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b), I review *de novo* those portions of the Order to which EDP has objected.

### IV. *Merits.*

■ The dispute lies in what legal significance, if any, can be attached to the signed March 12, 1999 letter. The central issue is whether the correspondence between the parties culminating in that letter constitutes a binding settlement agreement as opposed to an agreement in principle which the parties did not consider binding until the formal written agreement was signed. I must carefully appraise the letter to determine: a) if its terms are specific enough to constitute a contract; and b) if the parties intended the letter to be a binding contract. *See New York Life,* 80 F.3d at 410.

EDP has not directly challenged the magistrate judge's first and determinative finding that the parties did not intend the March 12, 1999 letter to be a binding contract. Accepting that the challenge is implied by its appeal of the second finding that there was no meeting of the minds as to the essential terms of the contract, I review *de novo* both aspects of the Order.

#### A. *Intent of the Parties.*

I first address whether the parties intended the signed March 12, 1999 letter to constitute a binding settlement agreement or whether they did not intend to be bound until a formal written agreement had been signed. The Colorado Supreme Court has noted that "[c]ourts scrutinize closely correspondence and telegrams [because] in many instances such letters are intended merely as preliminary negotiation." *Pierce v. Marland Oil Co. of Colorado,* 86 Colo. 59, 278 P. 804, 806 (1929) (internal quotation marks and citation omitted). In *Pierce,* the court noted that the essential question is: "Did the parties mean to contract by their correspondence, or were they only settling the terms of an agreement into which they formally proposed to

enter after all its particulars had been adjusted, and by which alone they intended to be bound?" *Id.* If possible, the parties' intent is to be determined from the face of the contract itself. *Gardner v. City of Englewood,* 131 Colo. 210, 282 P.2d 1084, 1090 (1955) (en banc).

When the language of an agreement demonstrates that the document is merely an agreement to agree, a court can rule as a matter of law, without resort to extrinsic evidence, that no binding contract exists. *New York Life,* 80 F.3d at 411 (restricting interpretation of the agreement at issue to the four corners of the document, and holding as a matter of law that the document was merely an agreement to agree).

In the March 12, 1999 letter, Benson asked Anderson to sign the enclosed copy of the letter "confirming our agreement **in principal** [sic]. We can then instruct our respective lawyers to come up with a formal agreement." (Emphasis added.) In addition Anderson signed under the words: "The foregoing correctly sets forth our agreement **in principal** [sic]." (Emphasis added.)

"As a rule, 'agreements in principle' that refer to subsequent 'formal agreements' are not binding." *Skycom Corp. v. Telstar Corp.,* 813 F.2d 810, 815 (7th Cir.1986). In *New York Life,* 80 F.3d at 409, the Tenth Circuit held a preliminary letter agreement which recited that it reflected the parties' "agreement in principle" was not an enforceable contract. Applying Colorado law, the court held the letter was an "agreement to agree" because it "clearly serve[d] the parties' goals of settling the terms of an agreement into which they formally proposed to enter after all of the particulars had been adjusted and by which alone they intended to be bound rather than forming a binding and fully integrated agreement." *Id.* at 410–11 (internal quotations omitted). The same reasoning applies to the March 12 letter referencing a yet-to-be drafted "formal agreement." Rather than explaining in detail the elements of a settlement, the

letter lists the material concepts relating to the covenant not to sue that would form part of the final patent agreement to be negotiated formally. The nine point letter is so cursory in its treatment of the issues involved in settling complicated lawsuits involving patents as to convince me that the parties did not intend that it be an enforceable agreement. *See Hill v. McGregor Mfg. Corp.*, 23 Mich.App. 342, 178 N.W.2d 553, 555 (1970) (finding a one page "Memorandum of Understanding" relating to the settlement of suits involving patents and manufacturing rights did not manifest an intention of the parties that it be an enforceable settlement agreement).[1]

I conclude the touchstone for determining the parties' intent, namely the language of the March 12, 1999 letter and its brevity, demonstrate that it was merely an agreement to agree and, as such, is not enforceable. *See New York Life*, 80 F.3d at 411; *Griffin v. Griffin*, 699 P.2d 407, 409 (Colo.1985 (en banc)). Even if I were to find, however, that the language of the March 12, 1999 letter is ambiguous, a review of extrinsic evidence, the circumstances surrounding the negotiation and signature of the letter, would lead me to the same conclusion.

The initial January 6, 1999 letter from Benson to Anderson stated: "The details of a formal agreement can be **negotiated** if we are able to reach agreement on the core elements" (emphasis added) and that the settlement would include the terms that followed. This letter reflects that the parties did not intend the hoped for "agreement on the core elements" to be binding, but that it would be followed by the **negotiation** of a final binding agreement, rather than the mere recording of the core elements in a formal document.

Following the signature of the March 12 letter, EDP's counsel prepared the "de-tailed agreement" contemplated in the letter. EDP's Draft Agreement, an eleven page single spaced agreement forwarded to counsel for Dataware on March 19, 1999, stated the parties sought to resolve all matters in litigation under the terms and conditions set forth in EDP's Draft Agreement. No reference is made to the March 12 letter or an existing agreement. Moreover, EDP's Draft Agreement interjects significant additional obligations and restrictions on Dataware not addressed in the March 12 letter nor the correspondence preceding it. These factors are inconsistent with EDP's claim that the parties intended the March 12 letter to be an enforceable final settlement contract. Had this been the case, EDP would not have attempted to negotiate a better deal by way of its Draft Agreement

In addition, paragraph 1 of the March 12, 1999 letter fixed the initial $20,000 payment by Dataware "at signing" and "$10,000 per quarter for ten quarters immediately following the signing." No money was requested or paid immediately following the signing of the letter. As stated in *Pierce*, "if it is reasonably doubtful whether what passed was only treaty, no action can be maintained on [the correspondence]. This is particularly true if the party attempting to enforce the contract has done nothing under it." 278 P. At 806. Only on April 6, 1999, after attempts at negotiating a formal agreement had failed, did Benson write Anderson stating that, pursuant to the March 12, 1999 agreement, Dataware now owed the first installment on the fixed royalty which should be remitted to EDP forthwith.

Furthermore, "[u]sage and custom may be decisive of the issue. The greater the complexity and importance of the transaction, the more likely its is that the informal

---

1. If preliminary agreements such as the March 12 letter were found to be final, integrated contracts, future parties would be reluctant to use such devices as a means of promoting settlement for fear of binding themselves to preliminary concepts. This would undermine the judicial policy favoring settlement of disputes. *See Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 262–63 (2d Cir. 1984) (holding "the magnitude and complexity of the deal ... reflect[s] a practical business need to record all the parties' commitments in definitive documents.")

communications are intended to be preliminary only." 1 Arthur L. Corbin, *Corbin on Contracts*, § 2.9 at 152 (1993). Patent agreements are recognized as complex transactions memorialized in lengthy written agreements. EDP's eleven page Draft Agreement, largely expanded from the one page March 12 letter, reflects that the letter was intended to be preliminary.

Primarily from the March 12, 1999 letter itself, I find the parties intended to be bound only upon signature of a formal written agreement. Even if I were to find the express language of the letter to be ambiguous and look at surrounding circumstances, it is clear that this was the case. On this basis alone, I deny the motion to enforce settlement.

B. *Agreement as to the Essential Terms of the Contract.*

■ In order for the March 12, 1999 letter signed by the parties to have created a contract between EDP and Dataware, there must have been agreement as to its essential terms. The Colorado Supreme Court explained in *Greater Serv. Homebuilders' Inv. Ass'n v. Albright*, 88 Colo. 146, 293 P. 345, 348 (1930) (en banc), that a contract is an agreement to do or not to do a particular thing. "If essentials are unsettled, and no method of settlement is agreed upon, there is no contract.... If the writing leaves the agreement of the parties vague and indefinite as to an essential element thereof, it is not a contract and cannot be made one by parol." *Id.* 293 P. at 348–49; *Stice v. Peterson*, 144 Colo. 219, 355 P.2d 948, 952 (1960) (a contract must be definite in its terms to be enforceable).

Here, although the March 12 letter was signed by Benson and Anderson, there was apparently no meeting of the minds as to the meaning of an essential term, namely that inserted by EDP in ¶ 6 of the March 12 letter, that the agreement was "nontransferable." EDP's Draft Agreement, in particular Subsection 6.1 and the later conflicting drafts of this subsection make it clear that the meaning of the phrase was not agreed by the parties. Accordingly, I

do not dwell on EDP's argument that the central error of the Order was the magistrate judge's assumption that the phrase prohibiting transfer was "... a zinger which was passed over without thought by Anderson when he signed the March 12, 1999 letter," (Order at 5).

Moreover EDP's Draft Agreement addressed other terms essential to such patent agreement which were not included in the March 12 letter, such as the patents and claims covered by the settlement. "It is an elementary doctrine of the courts of equity that they will not specifically enforce any contract unless it be complete and certain." *Mestas v. Martini*, 113 Colo. 108, 155 P.2d 161, 165 (1944). "The contract itself must make the precise act which is to be done clearly ascertainable.... It must be sufficiently certain and definite in its terms to leave no reasonable doubt as to what the parties intended, and no reasonable doubt of the specific thing equity is called upon to have performed, and it must be sufficiently certain as to its terms so that the court may enforce it as actually made by the parties." *Id.* at 166. The March 12, 1999 letter leaves doubt as to what the parties intended. For this reason too, I deny the motion to enforce it settlement.

V. *Conclusion*

The March 12 letter is not an enforceable contract, nor did the parties intend it to be one. In addition, the four corners of the document contain material terms that are too indefinite to be enforced.

Accordingly, I DENY EDP's Appeal, AFFIRM the Magistrate Judge's Order, and DENY EDP's Motion to Enforce Settlement.

A Minute Order dated April 30, 1999 granted EDP's Motion to Defer Briefing and Decision Regarding Motion to Stay (With Consent of Counsel). In light of my denial of the motion to enforce settlement, EDP shall file a brief in response to Dataware's April 19, 1999 Motion for Stay of Proceedings on or before December 1,

1999. A reply brief shall be filed on or before December 9, 1999. The briefs shall address, *inter alia,* the effect, if any, that a re-examination of United States Patent No. 4,939,674 may have on this and all related cases filed in this court, including but not limited to 99–K–555, 99–K–1889, and 99–K–1960.