# ADAMS *v.* HENDERSON.

## APPEAL FROM THE SUPREME COURT OF THE TERRITORY OF UTAH.

No. 70. Argued and submitted November 1, 1897. — Decided December 6, 1897.

A. & S. owned a tract of land in a township numbered 5 which was within the limits of the Union Pacific Railroad grants and was acquired from that company after the execution of its mortgages, its deed reserving to

the company the exclusive right to prospect for coal and other minerals on the lands. A. & S. contracted to sell this tract to R. & H., representing that they had a good and indefeasible estate in fee simple in it, and agreeing to furnish an abstract of title. R. & H. agreed to buy the tract for a sum named, to be paid partly in cash and partly by notes secured by mortgage on the property. The deed, mortgage, notes and money payments were accordingly made and exchanged in supposed compliance with the agreement, but no abstract of title was furnished. In the deed and mortgage the land was by mistake of the scrivener described as township No. 6 instead of township No. 5. A. & S. had no interest in or title to land in township No. 6. No patent was ever issued by the Government for land in township No. 5. R. & H., on learning the facts, demanded the return of the money paid, and of the notes, claiming to rescind the contract of sale. A. & S. tendered a deed of the land in township No. 5. Subsequent to the tender, the Union Pacific Company released the land from claim under the coal reservation, but not as to other minerals. *Held*, that R. & H. were not bound to accept the deed tendered, and were entitled to have the contract rescinded, and to receive back the money paid by them.

THE case is stated in the opinion.

*Mr. J. M. Wilson* for appellants. *Mr. John F. Dillon, Mr. E. Ellery Anderson* and *Mr. P. L. Williams* filed a brief for same.

*Mr. Charles C. Richards* and *Mr. James H. Macmillan,* for appellees, submitted on their brief.

MR. JUSTICE HARLAN delivered the opinion of the court.

By a final decree of the District-Court of the Fourth Judicial District of the Territory of Utah a contract for the sale of certain land, made March 27, 1890, between L. B. Adams and W. N. Shilling on one side, and Edward A. Reed and H. H. Henderson on the other side, and three promissory notes given by the purchasers, together with a mortgage executed by them to secure the payment of such notes, were adjudged to be null and void.

It was also adjudged that Henderson and Burgitt — the latter having become guardian of the person and estate of Reed who was incapable of conducting his own affairs — recover of Adams and Shilling the amount paid by Henderson

and Reed on the agreed price of the land purchased by them from Adams and Shilling.

The decree was affirmed by the Supreme Court of the Territory, and the case is here for review upon the appeal of Adams and Shilling.

The material facts out of which the case arises, and which are embodied in a report of a special master in chancery, are as follows:

In March, 1890, Shilling and Adams, in response to an inquiry made by Reed and Henderson, stated that they owned and had a good, indefeasible title in fee simple to 440 acres of land lying a few miles west of Ogden City, Weber County, Utah Territory.

The lands referred to — as was understood by all parties at the time — were the east half of section nine, township *five* north of range two west of the Salt Lake meridian; the south half of the southwest quarter of said section; and the northeast quarter of the southwest quarter of that section.

Reed and Henderson had not at that time seen the land, and had no knowledge as to the title. But Shilling and Adams promised that they would furnish an abstract of title. Reed and Henderson, relying and acting upon the representation of Adams and Shilling that they had a good and indefeasible estate in fee simple to the lands inquired about, without investigating the title, purchased an undivided two thirds interest in the 440 acres for the sum of $7333.32, of which one third was to be paid and was paid in cash, and time was given for the payment of the balance with interest. They would not have made the purchase if they had not believed the above representation as to title to be true.

On the 27th of March, 1890, Reed and Henderson received from Adams and Shilling a deed of general warranty for the following land: An undivided two thirds of the east half of section nine, township *six* north of range two west of the Salt Lake meridian, of the south half of the southwest quarter of that section, and of the northeast quarter of the southwest quarter of the same section, in Weber County, Utah.

The land contracted for, it will be observed, was in town-

ship *five*, while the land actually conveyed was in township *six*. But the grantors intended by the above deed to convey an undivided two thirds of the land in township five, and the grantees supposed that the estate embraced by the conveyance was that which they intended to purchase. But by mistake of the scrivener, the premises conveyed were described as lying in township six.

At the time the above deed was received the grantees, in addition to the cash payment of one third of the purchase price, executed two promissory notes payable to the grantors for the sum of $2444.45, each bearing eight per cent interest, payable one year and six months from March 26, 1890, and secured by a mortgage on the premises. But in that mortgage, by the mistake of the scrivener who prepared it, the land was described as lying in township six. The mortgage was duly signed, witnessed and acknowledged, Reed and Henderson, at the time, fully believing and acting upon the representation of the grantors as to title, and paying to the grantors the interest on said notes down to and including September 26, 1890, which amounted to $180. They also signed a promissory note of June 26, 1891, payable to the Utah National Bank of Ogden, Utah, for the sum of $391.10, as the interest on the above notes, which were held by the bank. The note last named was brought into court, and when the final decree was rendered it was still in court for the defendants.

The plaintiffs Shilling and Adams failed to furnish an abstract of title; and Reed and Henderson, having an opportunity to sell the land in township five, and assuming that that was the land conveyed to and mortgaged back by themselves, procured an abstract on the 3d day of September, 1891.

The above lands in township five are within ten miles of the line of the Union Pacific Railroad, and within the limits of the lands granted to that company by the act of Congress of July 1, 1862, c. 120, 12 Stat. 489. They lie in a valley at the base of the Wasatch Mountains, and had theretofore been used and cultivated as agricultural lands. But no exploration or examination has ever been made on them for coal or minerals of any kind or description.

As bearing on the condition of the title to the land in township five, it may be stated that the Union Pacific Railroad Company twice mortgaged all the lands granted to it by the act of Congress of July 1, 1862, c. 120, 12 Stat. 489, and the act amendatory thereof approved July 2, 1864, c. 216, 13 Stat. 356, one of the mortgages being dated April 16, 1867, and the other December 18, 1872.

Adams and Shilling acquired by proper conveyance made in 1889 all the interest of the Union Pacific Railroad Company in the lands in township five sold by them to Reed and Henderson, and freed from the liens created by the above mortgages, except that the deed received by them from that company contained a clause, *reserving* "to the said Union Pacific Railroad Company the *exclusive right* to prospect *for coal and other minerals* within and underlying said lands, and to mine for and remove the same if found, and for this purpose it shall have the right of way over and across said lands a space necessary for the conduct of said business thereon without charge or liability for damage therefor."

No patent has ever issued from the Government for the land in township five.

Parties applied to Reed and Henderson for the purchase of that land, but they declined and refused to buy, and a sale by them was defeated.

Within two days of the 3d of September, 1891, and before the bringing of this action, Reed and Henderson ascertained that the plaintiffs were not the owners of and had no title to the land which the deed from Adams and Shilling purported to convey to them, that is, to the land in township *six.*

On or about the 4th day of September, 1891, Reed and Henderson notified Adams and Shilling that they rescinded the contract of sale, and demanded not only the return to them of the moneys paid on account of their purchase, with interest, but the surrender of the two notes of $1444.45 each, bearing date March 27, 1890, and the note for $391.10, dated June 26, 1891. All of those notes had been returned by the bank to Adams and Shilling.

After Reed and Henderson notified Adams and Shilling of

the rescission of the contract of sale, and before the bringing of this suit, Adams and Shilling tendered another deed — a special warranty deed, containing a proper description of the land intended to be sold by them to Reed and Henderson. The latter refused to accept that deed, saying that they rescinded the contract of sale; that Adams and Shilling did not have a good title to the land described therein; and urging the objection also that the deed was not one of general warranty. The deed so tendered was dated September 29, 1891.

At the time Adams and Shilling tendered the deed of special warranty, the title to the land therein described was incumbered by the above reservation in the deed of 1889 made by the Union Pacific Railroad Company to Adams and Shilling, of an exclusive right in the Union Pacific Railroad Company to mine, under said land, for coal and other minerals, and to remove the same.

Subsequently, the Union Pacific Railroad Company executed and delivered to Reed and Henderson a quitclaim deed dated November 2, 1891, and which was acknowledged November 17, 1891, and duly recorded on the 8th of January 1892. This deed released the land in township five from the claim of that company under the *coal* reservation contained in the deed of 1889. But it did not release the right of that company to prospect for and mine " other minerals " under that land.

On the 28th of March, 1890, Reed and Henderson let, leased and demised unto Adams and Shilling, who were occupying the land, for the term of six months from that date the land in township five. But neither Henderson or Reed ever actually occupied any part of it.

Neither of the notes described in the mortgage of March 27, 1890, made by Reed and Henderson have been paid. Adams and Shilling are still the owners and holders of them, as well as of the mortgage. The amount unpaid on those notes is the principal of each one, with interest from September 26, 1890, at the rate of eight per cent. per annum.

The relief sought by the suit was a decree reforming the mortgage given by Reed and Henderson so as to correctly

describe the land in township five, and then a sale thereof in satisfaction of the costs of the action, and the balance of the purchase money, with a personal decree for any deficiency in purchase price that may be found to exist.

The defendants controverted the right of the plaintiffs to any decree, and, by cross-complaint, asked the cancellation of the above mortgage and notes, and a judgment for the amount they had paid to the plaintiffs with interest.

The decree rendered was in accordance with the prayer of the cross-complaint. In legal effect it was a decree rescinding the contract between the parties, because of the inability of the plaintiffs to make a sufficient title to the land sold by them.

Under the facts thus stated, the case is within a very narrow compass. It is found, and the plaintiffs and defendants agree, that the former intended to sell, and the latter intended to buy, the land in township five. By mistake the vendors conveyed land in another township which they did not intend to sell, to which they had no title, and which the defendants had no thought of buying; and by mistake the grantees, in order to secure the purchase price for the land they in fact purchased, mortgaged back to the plaintiffs the land in township six which the latter had assumed to convey to them. That a court of equity has power to correct this mutual mistake, make the instruments given in execution of the contract conform to the real intention of the parties, as established by clear and convincing proof, and hold the parties to their actual agreement, cannot be doubted.[1] But before the mortgage executed by the defendants can be reformed so as to properly describe the land which the plaintiffs intended to sell, and which the defendants intended to buy and mortgage

---

[1] *Snell* v. *Assurance Co.*, 98 U.S. 85, 88, 89; *Simpson* v. *Vaughan*, 2 Atk. 31; *Henkle* v. *Royal Exchange*, 1 Vesey Sen. 317; *Gillespie* v. *Moon*, 2 Johns. Ch. 585; *Keisselback* v. *Livingston*, 4 Johns. Ch. 144, 148; *Inskoe* v. *Proctor*, 6 T. B. Mon. 311, 316; *Hendrickson* v. *Ivins*, 1 N. J. Eq. 562, 568; *Wesley* v. *Thomas*, 6 Har. & J. 24, 26; *Newsom* v. *Bufferlow*, 1 Dev. Eq. 379; *Brady* v. *Parker*, 4 Ired. Eq. 430; *Bailey* v. *Bailey*, 8 Humph. 230; *Clopton* v. *Martin*, 11 Alabama 187.

back, it must appear that the plaintiffs have such title as they represented themselves to have when selling the land. A good and indefeasible title in fee imports such ownership of the land as enables the owner to exercise absolute and exclusive control of it as against all others.

That the plaintiffs have no such title is too clear to admit of dispute. They hold under the Union Pacific Railroad Company. They accepted a conveyance from that company which expressly reserved, in its favor, and without limit of time, an exclusive right not only " to prospect for coal and other minerals" under the land in question; and " to mine for and remove the same if found," but " a right of way over and across said lands a space necessary for the conduct of said business thereon without charge or liability for damage therefor." It does not appear that the railroad company is under any legal obligation to surrender or waive this reservation. The plaintiffs cannot compel it to do so. It is true that the reservation was subsequently released or withdrawn, so far as it related to coal, but it is in full force as to other minerals. So that the plaintiffs, in effect, ask that, instead of a good and indefeasible title in fee simple, the defendants shall take and pay for land incumbered with the right of the railroad company for all time, to pass over and across it for the purpose of prospecting for and mining minerals other than coal. A court of equity could not compel the defendants to take and pay for land thus incumbered without making for the parties a contract which they did not choose to make for themselves. "Equity," this court said in *Hunt* v. *Rousmanier*, 1 Pet. 1, 14, "may compel parties to perform their agreements, when fairly entered into, according to their terms; but it has no power to make agreements for parties, and then compel them to execute the same. The former is a legitimate branch of its jurisdiction, and in its exercise, is highly beneficial to society. The latter is without its authority, and the exercise of it would be not only an usurpation of power, but would be highly mischievous in its consequences."

Reference was made in argument to the fact that no patent has ever been issued to the railroad company for the land in

question, and it has been suggested by the defendants that if it was discovered, before a patent issued, that it was mineral land, the title of the company would fail altogether; for the grant made by Congress to the company did not include mineral lands. *Barden* v. *Northern Pacific Railroad Company*, 154 U. S. 288, 381. We do not think it necessary to consider this aspect of the case, nor to determine whether the plaintiffs would be entitled to the relief asked, if the mineral reservation had not been made by the railroad company, and nothing else appeared affecting the title except the fact that no patent had been issued by the United States, together with a possibility that before the issuing of a patent the land might be ascertained to be mineral land which did not pass under the grant by Congress. We forbear any expression of opinion upon that point, because if it be assumed for the purposes of this case that the fact just stated would not stand in the plaintiffs' way, we are of opinion that the mineral reservation made by the railroad company is in itself such an incumbrance as prevents the plaintiffs from making a good and indefeasible title to the land.

It is suggested that the reservation as to "other minerals" ought not to be deemed an obstacle to the relief asked, because it may never appear that there are any minerals under the land; that it cannot be assumed in the absence of proof that the defendants are likely to be disturbed in the full and complete enjoyment of the land for every purpose for which it is adapted. On the other hand, it cannot be affirmed, in view of the discovery of valuable minerals in many parts of the West, that there are no minerals, other than coal, under the land in question. What the defendants are entitled to is a marketable title — a good and indefeasible title in fee. But that they will not obtain, if forced to take the land subject to the railroad company's right of way over it for the purpose of prospecting for and mining minerals, which may be taken off, when found. From that burden they cannot be relieved in any way except by the voluntary action of the railroad company.

But it is contended by the plaintiffs that the act of March 3,

1887, c. 376, entitled "An act to provide for the adjustment of land grants made by Congress to aid in the construction of railroads and for the forfeiture of unearned lands, and for other purposes," 24 Stat. 556, the act of March 2, 1896, c. 39, 29 Stat. 42, and the concurrent resolution of June 10, 1896, 29 Stat. App. p. 14, confirmed as against the United States the right and title of *bona fide* purchasers of lands contained within the limits of railroad grants; so that, as against such *bona fide* purchasers, the United States, by the acts cited, expressly disclaims any rights whatever, and confirms absolutely the title of such *bona fide* purchasers. By this contention is meant that the act of March 3, 1887, as the same has been construed by this court in *United States* v. *Winona & St. Peter Railroad*, 165 U. S. 463, 466, 469, protects the title of Adams and Shilling as *bona fide* purchasers, even if, before a patent was issued by the United States, the lands in question should prove to be mineral lands.

It is sufficient, upon this point, to say that if the legislative enactments referred to have any reference whatever to *mineral* lands — if they were held applicable to lands purchased in good faith from the railroad company, and which turned out to be mineral lands that Congress never granted — that would only remove one of the difficulties which, it is insisted, are in the way of plaintiffs. For, if the plaintiffs' title is, under the legislation of 1887 and 1896, good as against the United States, there will still remain the incumbrance upon it arising from the right reserved by the railroad company, for all time — whether the plaintiffs or their vendees consented or not — to go upon the lands in question, for the purpose of prospecting and mining for minerals other than coal, and removing any found there. A patent would convey the interest of the United States in the land. But it would not destroy or release the mineral reservation made by the Union Pacific Railroad Company in its deed to Adams' and Shilling. Purchasers from Adams and Shilling would be bound by that reservation, even if the United States issued a patent to the railroad company or to its vendees.

The result of these views is that the defendants were not

bound to accept the deed tendered by the plaintiffs; and as it appears that the plaintiffs cannot make such a title as they agreed to give, as the cash payment was made upon the basis of a good and indefeasible title in the plaintiffs, the defendants were entitled upon their cross-complaint, framed in accordance with the established modes of procedure in the Territory, to have a decree which, in effect, rescinds the contract, and gives them back what they paid.

*Affirmed.*