No. 15,300.

BOWMAN ET AL. *v.* REYBURN ET AL.
(170 P. [2d] 271)

Decided April 29, 1946. Rehearing denied June 3, 1946.

Mr. MAX P. ZALL, for plaintiffs in error.

Mr. A. R. MORRISON, Mr. RALPH L. CARR, for defendants in error.

*En Banc.*

MR. JUSTICE STONE delivered the opinion of the court.

WILLIAM N. BOWMAN was a Denver architect. His wife Alice became the owner of all the capital stock of the Norman Apartments, Inc., which held title to an apartment building in Denver, subject to a first mortgage of $244,000 and a second mortgage of $49,500. Defendant Reyburn was a Kansas City contractor. Bowman and Reyburn together planned to construct a second apartment building on property adjoining that occupied by the first, and in November 1928 they entered into an agreement whereunder Reyburn was to advance money to Bowman for payment of defaulting taxes and interest and other pressing financial obligations and be secured by Mrs. Bowman's capital stock in the Norman Apartments, Inc., and other agreed collateral. Pur-

suant to such agreement Reyburn advanced in excess of $50,000. Included in these advances was the sum of $11,000 paid by Reyburn on March 7, 1929, to purchase Bowman's note then outstanding, secured by part of the second mortgage bonds of the Norman Apartments, Inc. Upon such purchase Bowman executed a new note to Reyburn for $11,000 maturing on the first day of July 1929 and secured by $26,000 face value of the bonds. Bowman defaulted in payment and, approximately a year after the maturity of the note, Reyburn advertised the collateral for sale. Bowman attempted by suit to enjoin the sale, then by agreement it was postponed to the twentieth day of August, 1930, and the bonds were then bid in for $1,100 by one Baker who thereafter transferred them to Rockhill Realty Company which turned them over to Rockhill Improvement Company on May 30, 1935.

Meantime, Bowman had defaulted in payments under the first mortgage obligation on the apartment house property and in December 1932 the trustee for the first mortgage bondholders started foreclosure. Thereafter, notwithstanding numerous disagreements, Bowman and Reyburn worked together to delay the foreclosure, Bowman's suit against Reyburn was later dismissed for want of prosecution and on June 29, 1935, the two men met in Denver and entered into the contract (Plaintiff's Exhibit C) of which specific performance is sought in this action. It was written by Reyburn's attorney, in long hand, at the hotel room where they conferred, and provided as follows:

"First:—That a petition under section 77 B shall be prepared and presented by the corporation known as The Norman Apartments, Inc. for reorganization as soon as same can be reasonably prepared.

"Second:—That the undersigned will work together for a reduction of the First Mortgage loan to the lowest point possible.

"Third:—The stock of a new corporation shall be issued one-half to Mr. Roscoe Rayburn and one-half to Miss Dorothy Bowman.

"Fourth:—That one-half of the net income, over and above the First Mortgage requirements shall be declared as dividends and paid to Roscoe Rayburn; the other half shall be declared as dividend on stock issued to Dorothy Bowman but shall be paid to Roscoe Rayburn until he shall receive therefrom the sum of Fifty Thousand Dollars ($50,000.00) at which time all the stock standing in the name of Roscoe Rayburn will be, without further payment, assigned by him to Dorothy Bowman or such party or parties as she may direct.

"Fifth:—As soon as the reorganization is completed as above provided, Mr. Rayburn will, in consideration of the stock and agreements above mentioned surrender all of the Bonds, Notes or other evidences which he has in his possession to Mr. & Mrs. W. N. Bowman, or the old corporation, or such other party as he may·direct.

"Sixth:—That Mr. Bowman or his family be allowed to retain his present apartment (#102) without payment of rental and also storage in garage."

Pursuant to the provisions of this pitifully meager agreement, there were negotiations and correspondence in which Bowman, Reyburn, and their attorneys participated, as a result of which on September 19, 1935, a petition was filed in the name of the Norman Apartments, Inc. for leave to reorganize under section 77-B of the United States bankruptcy laws. Under this petition there were submitted three alternative plans for compromise of the first mortgage bonds, second mortgage bonds and all other outstanding debts. None of these plans was approved by the first mortgage bondholders and the apartment property went to sale under foreclosure on October 14, 1935, whereat a representative of the bondholders' committee bid in the property for the sum of $164,000. After it became apparent that no reorganization was possible, and the property had

been sold under foreclosure, there were discussions by Reyburn and Bowman as to the possibility of redemption from the foreclosure sale in behalf of the second mortgage bondholders and as to procuring a loan sufficient to pay the amount for which the property was bid in, as well as with reference to agreement as to expense and method of procedure and reorganization, as to protection of Reyburn and as to ultimate ownership of the stock in the company which, in the event of redemption, should hold title to the equity in the apartment building. Englander, the manager of the apartment property, assisted in the efforts to save the property and to compose the differences between Bowman and Reyburn. In December 1935, Englander bought some of the second mortgage bonds of the face value of $8,500 which he turned over to Reyburn and the latter sold half of them to Bowman at the price paid, to wit, $425. They were apparently taken in the name of Bowman's daughter, Dorothy. Both Reyburn and Englander testified that when this sale was made they had come to a verbal understanding evidenced by pencil notations made on a copy of the old agreement of June 29, and that only upon approval of the contract as so modified would Reyburn agree to such sale, but when attempt was made to prepare a formal contract on the basis of those notations Bowman refused to sign. Bowman thereafter repeatedly insisted that no new agreement was necessary and that he was still acting under the old agreement of June 29, 1935, and demanded performance thereunder by Reyburn. On the second day of January 1936, without consultation with Bowman, a plan for redemption was filed in the name of the Rockhill Improvement Company as a second mortgage bondholder, providing in brief for procuring a new mortgage to pay the amount bid at the sale by the first mortgage bondholders and the organization of a new company to hold title subject to such new mortgage; the stock of the new company to be accepted by the second mortgage bondholders in propor-

tion to their holdings and in satisfaction of their bonds. Of the $49,500 second mortgage bonds outstanding, more than two-thirds were deposited with the referee in bankruptcy as approving the plan, to wit: $26,000 held by Rockhill Improvement Company, $2,000 of Reyburn's part of the $8,500 which had been bought through Englander, and all or part of $11,500 of the bonds which were later acquired and deposited by Englander. About May 1, 1936, this plan was approved by the federal court. Then Reyburn and Englander procured a mortgage loan with which to carry it into effect and a new corporation (defendant in error the Norman, Inc.) was organized and its corporate stock tendered to the holders of the second mortgage bonds, including stock to Dorothy Bowman on the basis of the $4,250 face value of the bonds purchased by her father from Reyburn for $425. In February 1936, Bowman filed petition in bankruptcy, listing his notes to Reyburn, but not the contract nor the balance of his debt to Reyburn not evidenced by notes. Thereafter the Bowmans made demand for an accounting and performance of the agreement of June 29, 1935, and upon refusal thereof filed this action on January 10, 1941, for specific performance of that contract, contending that the Rockhill Improvement Company, which filed petition for redemption, was owned and controlled by the defendant Reyburn and that the redemption as carried out was a reorganization as contemplated by their agreement of June 29, 1935. These contentions were put in issue by defendants' answer, and, after trial on the merits, the court below, determined that the weight of the evidence is to the effect that the contract sued upon here was at an end when the plan of reorganization first presented to the Federal Court failed of adoption, and that there is no equity in the bill. Accordingly, it found the issues in favor of defendants.

It is first contended that the court below erred in holding that the burden of proof rested on plaintiffs. On

June 29, 1935, when the contract was made, Bowman was the owner of the corporate stock of the Norman Apartments, Inc., which, however, was pledged to Reyburn to secure his advances. Bowman's $26,000 of second mortgage bonds had already been sold and were held by Rockhill Improvement Company. The other second mortgage bonds were held by numerous parties and Bowman had no interest in the property or hope of recovery except through such reorganization as would give some value to his capital stock. The one method of reorganization which could avail Bowman was through such compromise and adjustment of the mortgages and debts of the corporation as would prevent the elimination of this stock. The first paragraph of the agreement provides for petition for such reorganization to be presented by the corporation. That petition and plan of reorganization failed. The subsequent and successful petition was filed, not by the corporation, but by the Rockhill Improvement Company. It was not for reorganization, but for redemption. It provided, not for the protection of the stockholders, but for protection of the second mortgage bondholders. Such petition and redemption thereunder could not help Bowman, as he held no bonds, and it is not within the *apparent* provisions of the contract. Therefore, Bowman, who asserted that such petition and the reorganization thereunder were within the fair interpretation and *intended* provisions of the contract, had the burden of proof of that fact. It was part of his necessary proof of full performance, and the burden was upon him to show a full and complete performance or offer to perform on his part. *Forthman v. Deters*, 206 Ill. 159, 69 N. E. 97; *Boldt v. Early*, 33 Ind. App. 434, 70 N. E. 271, 49 Am. Jur. 190, §167. The trial court did not err in so holding.

 It is next urged that the court erred in finding there was no equity in plaintiffs' bill, and entering judgment of dismissal thereof. Considering the matters urged in plaintiffs' brief as showing equity in their bill,

all the acts disclosed to have been performed by Bowman were carried out in connection with the attempt to procure reorganization through the plan of the Norman Apartments, Inc., pursuant to the explicit provisions of their agreement Exhibit C. After that failed, nothing appears from the evidence as having been accomplished by Bowman in connection with the redemption of the property. Bowman was not in any position to redeem through the corporation, the Norman Apartments, Inc.; that would have required not only payment of the amount at which the property had been bid in, but also satisfaction of the encumbrance represented by the second mortgage bonds, the judgment, and of claims of other creditors of the corporation as well as settlement with Reyburn for the balance due him and for which he held Bowman's stock as security. Bowman had no money or property of any sort; he was then filing petition in bankruptcy whereby he became discharged even from his obligation to pay what he owed Reyburn. Redemption except through Reyburn was impossible, and he and Reyburn could not agree as to terms of cooperation. The evidence is not convincing that Bowman was influential in procuring any reduction of the price at which the property was bid in at the foreclosure sale; he may have sought to secure a new loan with which to redeem, but he did not succeed, and the loan was procured by Reyburn with the assistance of the bonds which had been purchased by Englander with his own money. Bowman participated in conferences with reference to redemption during the period while he and Reyburn were attempting to reach agreement for working together, but there is no showing of participation by Bowman thereafter and the plan for redemption was the work of Reyburn and his attorneys. Bowman purchased none of the second mortgage bonds except to the extent of $425. These he took in his daughter's name and they were not used in voting for the plan of redemption nor as security for the loan whereby the plan

90

was effected. The one act of Bowman in relation to the redemption was his signing of consent to the redemption in behalf of the Norman Apartments, Inc., the equity owner. This was prepared and tendered to him by Mr. Reyburn's attorney; it cost him no effort; it cut off no existing right, and was not necessary to the accomplishment of the redemption.

The provision of the contract, Exhibit C, that a petition for reorganization should be prepared and presented, placed upon Bowman equally with Reyburn the obligation of paying expenses in connection therewith, yet Bowman made no payment nor tender of any part of such expenses. Reyburn paid the filing fee, the expense of advertising, the expense of printing the three alternative plans of reorganization and of the letter to accompany the same, the expense of postcards for the convenience of the creditors in their approval or disapproval of the plans and the expense of postage and mailing. Reyburn himself made several trips to St. Louis to contact first mortgage bondholders and numerous trips to Denver. There is no evidence of any effort or expenditures whatever by Bowman, except presumably in the payment of his attorney who participated in working out the unsuccessful plans for reorganization. After the failure of reorganization all expense in connection with redemption was incurred by Reyburn. The entire proceeds of the loan obtained by Reyburn and Englander to procure money for redemption was spent in connection with the redemption and Reyburn personally advanced necessary money for interest between the date of redemption and the date of final settlement. We find no equities in plaintiffs' bill.

It is further urged that the parties to the contract, here under consideration, contemplated redemption by the second mortgage bondholders; however, the trial court has found to the contrary and since that finding is supported by substantial evidence it will not be disturbed.

■ Finally, it is urged that, in effect, Reyburn redeemed from the mortgage and that he owned the new company which took title to the property; that we should ignore the corporate fiction used to conceal his personal ownership, and that the court, having jurisdiction, should have settled all rights between the parties. Assuming, as may be justified by the evidence, that Reyburn controlled the Rockhill Improvement Company and that the latter was merely the vehicle through which he held the second mortgage bonds, carried out his plan of redemption and acquired title to the apartment house, we still find no basis for reversal, since plaintiff has failed to establish the existence of any contractual right upon which his interest may be founded. "The contract must be enforced according to its terms or not at all. A court is without authority to compel a party to do something he did not contract to do." *Schmidt v. Barr,* 333 Ill. 494, 165 N. E. 131, 65 A.L.R. 1. " 'Equity,' this court said in *Hunt v. Rousmanier,* 1 Pet. 1, 14, 'may compel parties to perform their agreements, when fairly entered into, according to their terms; but it has no power to make agreements for parties, and then compel them to execute the same. The former is a legitimate branch of its jurisdiction, and in its exercise, is highly beneficial to society. The latter is without its authority, and the exercise of it would be not only an usurpation of power, but would be highly mischievous in its consequences.' " *Adams v. Henderson,* 168 U. S. 573, 18 Sup. Ct. 179, 42 L. Ed. 584.

■ In an action for specific performance, the contract must be free from ambiguity and it must be clearly established that the demanded performance is in accordance with the actual agreement of the parties. *Offutt v. Offutt,* 106 Md. 236, 67 Atl. 138, 124 Am. St. Rep. 491. "A greater amount or degree of certainty is required in the terms of an agreement, which is to be specifically executed in equity, than is necessary in a contract which is to be the basis of an action at law for damages." Pom-

eroy's Specific Performance of Contracts (3d ed.), §159, quoted in *Ward v. Ward*, 94 Colo. 275, 30 P. (2d) 853, also in *Mestas v. Martini*, 113 Colo. 108, 153 P. (2d) 161. "There is no better established principle of equity jurisprudence than that specific performance will not be decreed when the contract is incomplete, uncertain, or indefinite." *Dodge Bros. v. Williams Estate Co.*, 52 Nev. 364, 287 Pac. 282. The situation presented in the instant case calls for the application of this principle.

Accordingly, the judgment is affirmed.

MR. JUSTICE BURKE and MR. JUSTICE BAKKE dissent.

MR. JUSTICE ALTER did not participate.

MR. JUSTICE BAKKE, dissenting.

I respectfully dissent. A reading of the Court's opinion discloses that it loses sight of the two primary reasons why Exhibit C was executed, viz., to repay Reyburn his $50,000, and to save something from the Norman Apartments for Bowman's family out of the reorganization. With these in mind, I propose to show that the prayer for specific performance should have been granted.

I take the liberty of restating the factual background as I gather it from the record: The two principals in the litigation are William N. Bowman and Roscoe Reyburn. Bowman is the husband of Alice, and father of Dorothy, the latter being the party in whose behalf the litigation was primarily instituted. Bowman was an architect and resident of Denver where he engaged in the practice of his profession for many years. Reyburn was a building contractor whose home and place of business was in Kansas City, Missouri.

Prior to 1928 Bowman and his wife, being desirous of improving certain real estate owned by them in South Denver, formed a corporation known as the Norman Apartments, Inc., for the purpose of constructing a large modern apartment building at a cost of over $500,000.

Of this amount, the Bowmans furnished $165,000; the balance being financed by a first mortgage bond issue of $350,000—negotiated through the Fidelity Bond & Mortgage Company—and by a second mortgage bond issue of $50,000. The building was completed and successfully operated until a short time later when the Fidelity Bond & Mortgage Company failed.

Following the completion of the building, Bowman became desirous of improving some additional vacant property he owned adjoining the Norman Apartments, and it was in this connection that he met Reyburn and prevailed upon him to advance him certain funds for the preparation of plans and for the payment of certain obligations that had accrued against the Norman Apartments.

In 1931, owing to the then financial depression, the plans for the new improvements had to be abandoned, and the Norman Apartments, Inc. was in financial difficulty. Meanwhile up to August 5, 1930, Bowman had become indebted to Reyburn in the sum of $51,060, secured by a pledge of second mortgage bonds of the face value of $26,000, and other securities. Foreclosure of the first mortgage was threatened, and both Bowman and Reyburn realized that their entire interests in the Norman Apartments, Inc. might be wiped out.

The contractor, a Mr. Tamblyn, who built the Norman Apartments, was given stock in the corporation in payment of his construction charges. He also had built the Colburn Apartments in Denver, in which Bowman had an interest. Bowman exchanged his interest in the Colburn Apartments to Tamblyn for the latter's interest in the Norman Apartments, Inc., so that in about 1932 all of the stock in the latter corporation was held by the Bowman family. It is not disputed that their investment represented their lifesavings.

Meanwhile, a Mr. Ben Englander, mutual friend of Bowman and Reyburn, had become the manager of the Norman Apartments. He was aware that a strained re-

lationship between Bowman and Reyburn had developed and suggested that they get together and settle their differences. As a result of this suggestion, Mr. Reyburn with his attorney, Mr. McCluer, came to Denver, and on June 29, 1935, at a meeting of the four men, Bowman, Reyburn, Englander and McCluer, Bowman and Reyburn entered into the contract, Exhibit C, set out in the Court opinion.

A few days thereafter Reyburn and McCluer returned to Kansas City, and McCluer wrote Bowman to retain Denver counsel to help him work with them under the contract, as a result of which Mr. Clarence Ireland was so employed (although Ireland had been working with Bowman prior to June 29, 1935, the date of exhibit C), about the same time Reyburn employed Mr. Arthur Morrison of Denver as his attorney.

Foreclosure proceedings meanwhile had been instituted by the first mortgage bondholders who were represented by a bondholders' committee, local counsel for whom was Mr. Walter Blood. Blood and Ireland cooperated specially on reducing the demand of the first mortgage bondholders to a figure that could be refinanced. They succeeded in reducing it from $350,000 to $164,000, the amount bid at the foreclosure sale by the second mortgage bondholders.

Meanwhile the Norman Apartments, Inc., filed a petition in bankruptcy for reorganization under section 77-B, and both sides were working on plans thereunder. The plans prepared by Mr. Bowman failed of approval because of inability to obtain the consent of the necessary number of first mortgage bondholders.

Thereafter, Morrison concluded that a plan could be developed under which the second mortgage bondholders could redeem from the foreclosure which had been decreed in the state court, and in furtherance of this plan Englander proceeded to purchase as many of the second mortgage bonds as he could for ten cents on the dollar. It is to be remembered that $26,000 face value of

these bonds had been pledged to Reyburn by Bowman in 1930, and that they were sold at a sale advertised for that purpose on August 20, 1930. They were bid in by Mr. Baker, one of Reyburn's associates, and after transfer from one to another of Reyburn's corporations they came into the assets of the Rockhill Improvement Company of which Reyburn became a stockholder and president in the early part of July, 1935.

Englander succeeded in acquiring about $12,000 face value additional of the second mortgage bonds, $8,500 of which was equally divided between Reyburn and Bowman, the latter paying Reyburn $450 in cash for his share. At this juncture, a dispute arose as to how the stock in the new corporation should be divided, and several new agreements were tendered back and forth, but no new contract was executed, and Bowman insisted that he would rely upon the contract, exhibit C. At any rate, the $26,000 worth of bonds the Rockhill Improvement Company allegedly had, and the others which Englander had purchased, were used either directly or indirectly in the redemption and refinancing of the property which was ultimately approved by the federal court. Following the approval a new corporation was formed, known as "The Norman Inc.," of which Mr. Reyburn took charge, and, instead of responding to the provisions of exhibit C regarding the distribution of the stock, he tendered Dorothy Bowman stock in consideration of the $425 that her father had paid him for the one-half of the heretofore mentioned $8,500 second mortgage bonds, as a result of which Bowman brought this action to have the terms of exhibit C specifically enforced.

The trial court was of the opinion, and so held, that the burden was upon Bowman to show that exhibit C was still a binding agreement after the reorganization plans, as submitted by Bowman, were rejected, and that Bowman failed to sustain this burden. The trial court also stated that he "saw no equity in the bill;" that the

contract was not possible of specific performance and that there was no prospect of Reyburn being reimbursed for the $50,000 expended by him other than by turning the property over to him, and the trial court ordered accordingly.

I think the Court's opinion affirming that judgment is erroneous for the following reasons: 1. Exhibit C was not terminated by the failure of approval of the reorganization plans submitted by Norman Apartments, Inc., and the burden of proving termination was on Reyburn. 2. The $26,000 in second mortgage bonds were in Reyburn's possession at the time exhibit C was executed. 3. There was equity in the bill. 4. The conflict in the evidence is not fatal to recovery. 5. The contract is not impossible of performance.

1. The Court misapprehends the argument of counsel for Bowman. He concedes the rule that the burden is on him to show full performance. The rule he is contending for is that when Reyburn urges termination, the burden is on him to establish that fact and in that contention counsel for Bowman is right. In the case of *Adams v. Giraud,* 69 Colo. 112, 169 Pac. 580, we had a strikingly similar situation so far as the language relied upon is concerned. As hereinafter noted, counsel rely upon Bowman's statement that the plan of reorganization of the Norman Apartments "was out." In the Adams case, supra, the language used was, "all of those cattle, they are all yours, I am out of it." We held that those words—assuming they were used—did not terminate the contract, and we reversed the judgment, saying: "The burden to prove an agreement to rescind, is upon the party alleging it." The same rule applies as to abandonment (1. C.J.S. 15), and it is obvious that that is what counsel for Reyburn is relying upon when he uses the words "they were out." The argument made in support of the abandonment of exhibit C is, that said contract contemplated only a plan or reorganization submitted by

the Norman Apartments, Inc. and did not include the plan of redemption ultimately approved by the federal court. I think this contention is not tenable under the evidence. In the first place Reyburn, in his answer to the complaint, "admits that a plan of reorganization was filed by the Rockhill Improvement Company, which plan, together with certain amendments thereto, was later approved by said United States District Court." The proceeding in the federal court, in which the plan was approved, is entitled: "In the Matter of the Norman Apartments, Inc. (In proceedings under Section 77-B of the Bankruptcy Act"). No specific testimony appears in the record showing that exhibit C was ever abandoned, even by Reyburn. The testimony relied upon is that given by Bowman, and which counsel for defendants interprets as being an admission that "they [Norman Apartments, Inc.] were out." The testimony concerning this phase of the case is as follows: "Q. And Mr. Mc-Cluer wrote you, in response thereto, that Mr. Reyburn would cooperate if you desired to dismiss at once your suit against Mr. Reyburn. Did you do it? A. I believe it was already dismissed under the rules. I believe that is what I found out when I inquired into it. Q. That is why you took no further action? A. Yes. Q. Because you found out, when you received Judge McCluer's letter, Exhibit B, that the case had already been dismissed under the rules? A. Under the rule." Exhibit C is not mentioned. "The Court: Myer's note was paid off or taken up? Mr. Morrison: Yes. Q. That is the same note referred to in Exhibit No. 2 as the note of March 9, 1929, isn't it? A. March 7th, it says here. Q. That is the same note? A. Yes. Q. Now then, you say that you procured from the Union Deposit Company a list of the second mortgage bondholders at the request of Mr. Reyburn? A. Yes. Q. And that was after you saw that the plan of reorganization submitted by the Norman Apartments, Inc., was out? A. Yes." This would not preclude any

other plan of reorganization possible under 77-B and it indicates that Bowman continued working with Reyburn.

Regarding a list furnished the referee in bankruptcy proceedings, Bowman testified as follows: "Q. And notwithstanding that you had furnished him a list prior to October 18, 1935, he requested you, after you found you were out on that petition under 77-B, to get him another list? A. We knew we were out on that in September. Q. You did? A. We knew it was not coming in. Q. What was not coming in? A. The answers. Q. Answers to what? A. The cards we sent out. Q. When did you send the cards out? A. I don't remember. Q. Approximately. A. I don't remember now. Q. Was it before or after October? A. I think it was about the latter part of September. Q. That you sent the cards out? A. I think so. Q. You didn't send the cards out until you submitted your tentative plans, as shown by Exhibit No. 1, did you? A. We sent cards out as soon as the páper was ready." It can hardly be said that this is evidence of the abandonment (or that it was "at an end" as the trial court stated) of exhibit C. It will be noted that Reyburn's counsel refers to Bowman's plans as tentative. On the positive side, after the rejection of the Norman Apartments plan there were further conferences between Bowman and Reyburn and additional contracts considered, but they could not agree on any new contract and none was ever signed. This was in November and December of 1935. About the same time Reyburn's Denver attorney concluded that the reorganization could be effected through redemption of the property by the second mortgage bondholders, and Englander, the resident manager of the apartments, proceeded to purchase as many of those bonds as he could, and he testified that the bonds so purchased were used in the redemption.

In December, 1935, Bowman wrote Reyburn that the bankruptcy court had fixed January 3, 1936, as the time

for filing new plans, and on December 31, 1935, Bowman sent a telegram to Reyburn as follows: "Must submit reorganization plans before January third. Under our agreement we are to work together. Have been expecting to hear from you. Advise by telegram your intentions. Failing to hear from you shall proceed as I am advised nevertheless holding you to our agreement." In response to this, Reyburn wired Bowman as follows: "Denver before third with plan. Suggest you prepare one also."

Reyburn came to Denver with his plan, which was that of redeeming with the second mortgage bonds. The plan was submitted to the court. Bowman was asked for, and gave, his written consent thereto. The opinion says the consent was unnecessary. Reyburn's counsel thought it was. The plan was approved and the new corporation formed. It was not until after all this had transpired that Reyburn, through his attorney, advised Bowman that he, Reyburn, "should not be embarrassed further by such a discussion." This is the first positive statement of abandonment in the record. Under these circumstances it cannot be said that exhibit C was "at an end." Whether the redemption plan was specifically contemplated by the parties at the time exhibit C was signed is not important. That it was within the legal contemplation is shown by Reyburn's answer, above noted, and by the title of the proceeding in which the plan adopted was approved. As further proof that the redemption plan was within the legal contemplation of 77-B, I quote the testimony of Mr. Morrison, who devised that plan. He states: "I had run into a federal case under 77-B in which they had allowed what it termed the equity of redemption, to be reorganized, and I suggested that to *everybody* in connection with this. It must have been the latter part of October. Then I ran into another 77-B case which allowed a plan to be submitted to take care of a single unit of property of the debtor. So, with those two cases, and discussing them

with practically *everybody* connected with it, in about October I filed a petition on behalf of the Rockhill Improvement Company in the 77-B proceeding, to be allowed to submit a plan on behalf of the Rockhill Improvement Company to redeem on their behalf from the foreclosure sale, and that plan was filed on January 3, 1936." (Italics are mine.) Does this sound like abandonment? If it was, why should Morrison bother about talking to anybody? Assuming the cases Morrison found to be reported cases, we can also assume that they were decided prior to June 29, 1935, when Exhibit C was signed and constituted authority for reorganization by redemption. Morrison's knowledge of these cases will be imputed to Reyburn who certainly should not be permitted to take advantage of them to Bowman's detriment. The relationship was one of special trust and confidence. "The maxim 'id certum est quod certum reddi potest' is frequently applied to hold that contracts are sufficiently certain for specific performance where the terms of the contract, although not complete in themselves, are rendered certain by reference to other matters whereby completeness may be attained." 49 Am. Jur. 37, citing *State Highway Commission v. Ames,* 143 Kan. 847, 57 P. (2d) 17, wherein the contract involved recited that the act to be done should be done "as required by the Kansas State Highway Commission" and was held to be specifically enforceable. So here, any reorganization plan approvable under section 77-B should be construed as being within the legal contemplation of the parties.

2. In exhibit C, as has been noted, Reyburn agrees to "surrender *all of the bonds,* notes or other evidences which he has in his *possession* to Mr. and Mrs. W. N. Bowman * * * or such other party as he may direct." (Italics are mine.) This agreement was executed June 29, 1935. At the time, Reyburn was directly or indirectly closely associated with several corporations in Kansas City, concerning which I will comment briefly. As has

already been noted, he was in the building and contracting business. To use his own words: "I am the Reyburn Construction Company." His business was to take the contract to do the actual building. Each time a new building was to be constructed he would organize a separate company. There were at least three of these, viz., The Rockhill Realty Company, the Rockhill Investment Company and the Rockhill Improvement Company, each of which in turn financed a building constructed by the Reyburn Construction Company, and frequently there would be a transfer of assets from one to the other to facilitate the over-all operation. They were all closed corporations, composed of three or four stockholders who were closely associated with Reyburn in his business.

When the above mentioned $26,000 worth of second mortgage bonds were sold in Kansas City, they were purchased for $1,100 by one Baker who was an officer of one of the Rockhill companies and clerk of the bankruptcy court. His office adjoined that of Mr. Reyburn. Even assuming that this sale and the various transactions whereby the bonds became the property of the Rockhill Improvement Company were valid, Reyburn admitted on the stand that prior to the time he became a stockholder and president of the Rockhill Improvement Company in July, 1935, he "held its paper." He admits the conversation "about my having paper, owning it" and it was this very paper that the stockholders of the Rockhill Improvement Company—there were only three of them—were talking about as being the basis for redemption, which was the $26,000 in second mortgage bonds originally pledged to Reyburn by Bowman, and it was at least part of "the paper" which Reyburn said he held on June 29, 1935. A few days thereafter, Reyburn became a stockholder and president of the Rockhill Improvement Company, as above noted, and he and his attorney, Mr. McCluer, were the only persons who have had anything to do with these bonds, and when

they tendered their plan to the federal court in the first week of January, 1936, they must have had them in their actual possession. The Court opinion concedes, as I read it, that the Rockhill Improvement Company "was merely a vehicle through which he [Reyburn] held the second mortgage bonds." The Rockhill Improvement Company did not come out on the train from Kansas City; it was Reyburn, the man, and *he* had those bonds in his "possession" which is the word used in Exhibit C. Reyburn promised to redeliver these specific bonds to Bowman when he was trying to persuade Bowman to sign a new contract during the months of November and December. In view of this situation, Reyburn's assertion that he had no bonds in his possession avails him nothing. The lack of description of the bonds in paragraph "Fifth" of exhibit C was not fatal to specific performance. *Marsh v. Brown-Crummer Inv. Co.*, 138 Kan. 123, 23 P. (2d) 465, 88 A.L.R. 835. There is nothing in this record to indicate that Reyburn ever ceased holding "the paper" of the Rockhill Improvement Company, or that he does not still hold it. So, whether the words, "all of the bonds * * * which he has in his possession" are construed to mean bonds which he had in his possession on June 29, 1935, the date of exhibit C, or the bonds he had in his possession "as soon as the reorganization is [was] completed," as recited in paragraph "Fifth" of exhibit C, the result is the same. Under exhibit C he obligated himself to return them to Bowman. There is no good reason why the court could not require him to do so.

3. That there was equity in the bill appears to be without question. The Court, in its opinion, instead of discussing the real equities (the respective contributions made by the parties), dwells on Bowman's inability to contribute to the expenses in November and December of 1935. If Reyburn kept account of these expenses he can recover every cent of them. That the Bowmans put $165,000, which represented their lifetime savings, into

this project is not denied, and one of the primary purposes of exhibit C was to save a part of this investment for them, the other purpose being the repayment of the $51,000 that Bowman owed Reyburn. At the time exhibit C was signed, the Bowmans were the sole stockholders of the Norman Apartments, Inc. Reyburn had no interest in it, except as a personal creditor of the Bowmans. If the trial court intended to hold that Bowman's "equity," i.e., his legal claim to the property subject to the first and second mortgage bonds, could have been wiped out by the foreclosure, it was right, but no such technical meaning of the word should be conclusive here. When the first mortgage bondholders agreed to take about fifty cents on the dollar, and the second mortgage bondholders surrendered their bonds for ten cents on the dollar, there was plenty of "equity" left in this property for the Bowmans. That this reduction was brought about by the joint efforts of Bowman and Reyburn, their attorneys, and Mr. Blood is clear. To permit Reyburn to obtain practical ownership and exclusive control of this half million dollar—(I take judicial notice that under present inflated values, it is probably worth a million)—property, subject only to the $175,000 borrowed to redeem it from foreclosure, on a technical and questionable purchase of the second mortgage bonds by a closed corporation—of which he became president and exclusive manager a few days after he signed exhibit C—is, as I believe, clearly a transaction to shock the conscience of the chancellor. Even assuming that Reyburn had a technical legal right, "equity does not always follow the law." 19 Am. Jur. 313; *Kern v. Campbell,* 97 Colo. 64, 47 P. (2d) 688.

In the recent case of *Dittbrenner v. Myerson,* 114 Colo. 448, 167 P. (2d) 15, our consciences were disturbed because a real estate man purchased property from a woman for $10,000 and sold it a few weeks later for $20,000, and we set the deal aside. Here, if the Court's opinion is permitted to stand, the ratio is about 10 to 1

in favor of a deal that is similar in many respects. The result of the opinion in the Dittbrenner case was to grant Mrs. Dittbrenner's request for specific performance to reconvey.

4. In this very lengthy record, it is not surprising that there is some conflict in the testimony, but I disagree with the trial court, and this court, in their conclusion that there was conflict as to the vital points. As already noted, there was no conflict as to the execution or validity of exhibit C when it was signed; there is no conflict as to the financial contributions of the respective parties; there is no conflict as to the reduction of the indebtedness of the first and second mortgage bondholders; there is no substantial conflict concerning these men working together up to the time Reyburn's plan was submitted to the federal court. The principal asserted conflicts were in connection with the question of whether the Norman Apartments were "out" and whether Reyburn was, in legal contemplation, the Rockhill Improvement Company, or vice versa. However, as above noted, in view of Reyburn's admissions, these conflicts cannot be considered as serious. *Kern v. Campbell, supra.*

5. The contract is possible of performance. Having shown by Morrison's own testimony that the plan approved by the federal court was within the legal contemplation of the terms of paragraph "First" of exhibit C, there has been a compliance with those terms. The conditions set forth in paragraph "Second" admittedly have been performed. The terms contained in paragraphs "Third" and "Fifth" require ministerial acts, and can be performed in a very short time. The conditions set forth in paragraph "Sixth" were performed until Reyburn took over the "Norman, Inc.," i.e., the new corporation, on August 26, 1936, and the Bowmans have been paying rent under protest since. The rent so paid can be refunded or applied to Bowman's present indebtedness to Reyburn, if any. There remains only the terms of paragraph "Fourth" about which there could pos-

sibly be any question. There is some ambiguity concerning the amount of dividends that Reyburn is to receive on the stock of the Norman, Inc., i.e., the new corporation, but when the first clause of that paragraph is construed in connection with the rest of the paragraph and paragraph "Third," the conclusion is inescapable that when Reyburn will have received his $50,000, and has been reimbursed for reasonable expenditures in connection with the reorganization, then all of the stock in "The Norman, Inc.," should be turned over to Dorothy, subject to whatever qualifying shares in the corporation are necessary, and issuance of the stock to others holding second mortgage bonds, if any, in accordance with the federal court's order, all of which can be accomplished after an accounting of the books of "The Norman, Inc."

The case of *Smurr v. Kamen,* 301 Ill. 179, 133 N.E. 715, 22 A.L.R. 1023, is quite similar to the case at bar. There, the corporation also was in financial difficulty and had to be reorganized. The two principal stockholders entered into a written agreement, not unlike exhibit C in the instant proceeding, whereby one of them was to receive certain stock in the new company for financial assistance rendered, said stock to be surrendered upon his being repaid. The new company prospered and the man who had made the advance sought to repudiate the contract and retain the stock. The Supreme Court in reversing the judgment of the lower court, said in part: "Equity looks through forms to the substance of a transaction, and will not permit the rights of parties to be sacrificed to the mere letter but will look to the spirit of the transaction to discover the truth," and decreed specific performance of the contract. While this case was not cited in the briefs, it is very much more in point on the whole case than Schmidt v. Barr, the Illinois case cited in the opinion.

I am not overlooking the fact of Bowman's personal bankruptcy, but since exhibit C was not scheduled as

an asset in that proceeding, and no issue on the matter of said bankruptcy is raised by the pleadings, and the trial court made no adjudication concerning it, I make no comment relative thereto.

I believe exhibit C contains all of the requisites of an agreement that may be specifically enforced, and having in mind the two main objectives of Exhibit C, I feel that the trial court erred in ruling otherwise. 49 Am. Jur. 39.

Mr. Justice Burke concurs in this opinion.