No. 18,028.

ELI HILL, ET AL. *v.* DAN CHAMBERS, ET AL.

(314 P. [2d] 707)

Decided August 26, 1957.

Messrs. McDougal & Rogers, for plaintiffs in error.

No appearance for defendants in error.

*In Department.*

Mr. Justice Sutton delivered the opinion of the Court.

The Hills were defendants and the Chambers were plaintiffs in the trial court and we will refer to them herein by name or as they there appeared.

In 1954 plaintiffs filed their complaint alleging that about April 1951 defendants orally promised to convey to plaintiffs one acre of land described therein, located in Adams County, Colorado, if plaintiffs would build a house thereon. The consideration alleged was the actual construction of the house in reliance on the gift. Plaintiffs further alleged that the house was built, that it has a reasonable market value of $15,000.00 (later testified to as approximately $7,000.00), asked specific performance of the agreement to deed the land, for damages of $1,000.00, and if specific performance was not granted, then for judgment in the amount of $16,000.00. Defendants answered with a general denial and asked that the action be dismissed. Following trial to the court judgment was entered for the plaintiffs which judgment upon motion was corrected to include an order that plaintiffs pay part of the taxes on the property. Motion for new trial was overruled and defendants are here by writ of error urging seven grounds for reversal, all of which hinge on the question: Was the alleged contract enforceable? The Chambers have entered no appearance, filed no brief in this court and their time to do so has expired. We note that Hills' counsel was changed following the trial below and that present counsel are not to be blamed for the alleged failure of defendants

to present all their evidence at the trial as was urged below as grounds for a new trial.

The record shows that prior to this controversy the Chambers, parents of twelve children with nine of them still at home, were nearly destitute and living in New Mexico where Mr. Chambers was ill. During this time Mrs. Hill, who was Mr. Chambers' sister, stated that if the Chambers family would come to Colorado that they would help them build a home. In due course the Chambers arrived and were donated living quarters in two small cabins located next to a five-acre tract owned by defendants in Adams County. While a house for the Chambers was being built on the Hill land the Hills continued to live next to it and often furnished meals and other help to the Chambers. The undisputed evidence is that a six-room cinder block house was built. This was done partly with labor of an unknown amount and with materials of approximately $2374.00 furnished by plaintiffs, together with labor and materials donated by friends of the Hills in unspecified amounts and disputed labor donated by the Hills with materials furnished by them of approximately $300.00 in value. As to the labor and donations of the Hills the confused state of the evidence indicates that if they were to be recompensed it was to be only if they later built a third house on the five-acre tract, in which event Mr. Chambers was to furnish an unspecified amount of labor.

During the course of the trial defendants' counsel, at first without objection, introduced evidence of a later disputed oral agreement of the parties relating to the drilling of a water well and the installation of a pump. This well is on defendants' land and the water is used for both the Hill and Chambers houses. Needless to say this matter and the Chambers' neglect or refusal to pay for half the well as the Hills contended or for water rent as the Chambers contended had nothing to do with this dispute and the trial court properly declined to decide that issue. It appears however that this and

other extraneous problems were the real causes of the disputes between these parties except for the amount of land to be transferred.

The record further shows that once the Chambers' house was finished they apparently lived therein content to let matters rock along and not bothering to have settled such essentials as taxes, water and conveyance of the land. This course continued until they were denied a deed because they did not have the plot surveyed presumably so that a deed description could be formulated.

The general rules relating to this type of action and comment thereon will be helpful at this time.

█ Specific performance will not be decreed unless the property to be conveyed is fixed with certainty as to the locality and description or is such that it can be ascertained with certainty. *Waterman On The Specific Performance of Contracts* (1881). Here the record shows that with the assistance of external evidence (the surveyor's plat based upon the stake and position of the defendants' land in relation to adjoining properties and the testimony of other witnesses than these parties) that the description, without being contradicted or added to, can be connected with and applied to the land intended, to the exclusion of all other property. See *Noland v. Haywood*, 46 Wyo. 101, 23 P. (2d) 845. In 81 C.J.S. 490, § 33, it is said: "The contract may be specifically enforced where extrinsic evidence is required to apply, but not where it is required to supply, the description of the property involved," citing several authorities including the Noland case supra.

██ The rule is that in every case where suit is brought to enforce specific performance of a contract, the contract must be clear and established beyond question, and even then the granting or refusing of the requested decree rests largely in the discretion of the court. *Mestas v. Martini*, 113 Colo. 108, 155 P. (2d) 161, and see *Bowman v. Reyburn*, 115 Colo. 82, 170 P. (2d)

271. Equity will not decree specific performance of an oral contract to convey land if there is an adequate remedy at law. *French v. Mitchell, et al.,* 92 Colo. 532, 22 P. (2d) 644. In an action for specific performance, the contract must be free from ambiguity and it must be clearly established that the demanded performance is in accordance with the actual agreement of the parties. *Bowman v. Reyburn,* supra. In Colorado it has been held that part performance of a parol agreement under certain circumstances is sufficient to authorize specific performance, such acts as possession and making permanent and valuable improvements being sufficient if the agreement can be established. *Hunt v. Hayt,* 10 Colo. 278, 15 Pac. 417.

"* * * the terms of a contract must be expressed with reasonable certainty, and what is reasonable in any case must depend upon the subject-matter of the agreement, the purpose for which it was entered into, the situation and relations of the parties, and the circumstances under which it was made. *A greater amount or degree of certainty is required* in the terms of an agreement, which is to be specifically executed in equity, than is necessary in a contract which is to be the basis of an action at law for damages. * * *" *Pomeroy's Specific Performance of Contracts,* Third Edition, 1926, p. 403, § 159.

In the case at bar the great weight of the evidence shows that a valid and enforceable oral agreement to convey land, not subject to the statute of frauds (C.R.S. '53, 59-1-8), was entered into between these parties. The essential evidence shows: the offer and acceptance; the completed performance in reliance upon the offer (see 58 C.J. 929, § 95 and 933, § 97 and 49 Am. Jur. 34, § 22); further, that Mr. Hill put in one stake along the public road which stake was used by the Chambers' surveyor (once they had a survey made) to measure the one acre to be deeded; that Mr. Chambers put in additional stakes based upon the first stake but these were not essential

to the survey; that disinterested witnesses were present at various times when either or both of the Hills stated they were donating "one acre"—though Mr. Hill denied this; and that Mrs. Hill herself testified: "Not long after we started this house or business, I called Mr. and Mrs. Chambers in conversation about, we was ready to give them a deed. If they will pay the surveyor to come and survey the land, I would gladly have given them a deed." Q. Did they get a surveyor? A. No, they didn't. Q. What did they tell you?"

She then testified that Mr. Chambers wanted the land left in the Hills' name because the Chambers were getting some welfare assistance and then:

"Q. Did you have any discussions after that about giving them a deed? A. No, we eventually went into fusses and fights about him not accepting his land in his name and taking his own responsibility. * * * It is not our fault Mr. and Mrs. Chambers got us in a lawsuit about a deed, because they knew until we moved we would have gladly given it to them, but he wouldn't pay for the surveyor."

Later Mrs. Hill testified: "* * * I want them to have it (the house). I want them to have it for the children." Q. Yes, but what are you willing to give? A. * * * I will give * * * half an acre of land for them children, but not * * * to sell or mortgage up."

She later further testified:

"Q. I asked you, did you ever offer him a deed and you said yes. A. I offered to give him a deed if he would have the land surveyed, he would pay the surveyor to survey the land. Q. Did you ever at any time after 1951, after 1951, have a deed drawn to give to him? A. No, sir, because he wouldn't pay the surveyor and I thought it was terrible for me to give him the land and then pay the surveyor to have it surveyed and deed it to him. Q. Did you think it was terrible for you to keep his house? A. Keep his house? Q. Yes. A. I am not keepin'

his house. Q. You haven't given him a deed to it?. A. It is his fault."

Mr. Hill's testimony as to the quantity of land was that they were to give the Chambers "enough to build a house if he came." Earlier he had testified that "when we got the house built I staked off what I give him."

It thus appears that: the Hills in fact dispute only the quantity of the land to be conveyed which clearly appears from the testimony of disinterested witnesses as well as the Chambers to be "one acre"; and that they further refused to convey because of extraneous matters in dispute between the parties and for failure of the Chambers to furnish a surveyed deed description at the time the Hills wanted it—but when no definite time had been agreed upon. Thus, the record showing a valid and enforceable oral contract with the land itself being capable of identification, the defendants have no valid defense to the action.

This case falls squarely within the powers granted the courts by C.R.S. '53, 59-1-10 which states in relation to the statute of frauds: "Courts may enforce specific performance.—Nothing in this article shall be construed to abridge the powers of courts of equity to compel the specific performance of agreements, in cases of part performance of such agreement."

Here substantial competent evidence in the record fully sustains the trial court in exercising its sound judicial discretion (see 81 C.J.S. 89, (Specific Performance) in decreeing specific performance of the oral agreement. Such findings and decree so supported will not be disturbed on review. *Bowman v. Reyburn,* supra. *Jutten v. Deeble,* 88 Colo. 301, 295 P. 496. The case at issue here is similar but much stronger than *Zamboni, et al. v. Graham, et al.,* 104 Colo. 23 at p. 26, 88 P. (2d) 98. In the latter case this court affirmed a decree of specific performance of land and buildings. There the court ordered conveyed 1.9 acres out of 156 acres at $100.00 per acre since that was the reasonable amount of

land it deemed necessary to go with buildings erected in reliance on an oral agreement to sell and buy five acres at $50.00 per acre. The court there said:

"Ordinarily, of course, equity will not decree specific performance of a contract where it is so indefinite and uncertain as to be incapable of being specifically enforced, but this rule does not deprive a court of the power and duty to effect an equitable adjustment between litigants when it is admitted that both parties have some rights in the subject of the controversy. In this case it is obvious that money damages would be insufficient to compensate the Grahams for what they had built into, and what Zamboni acknowledges to be, their home. Pomeroy's Specific Performance (3rd Ed.) Sec. 115-117. * * * In view of the fact that the Grahams expended from $1200 to $1500 in labor and materials in building their home on the land in reliance on Zamboni's consent, we think it clearly apparent that there was sufficient part performance to overcome the defense of the statute of frauds. * * * It may be conceded, as the trial court pointed out, that there was no definite contract, as such, that could be specifically enforced in all particulars. Assuming there was agreement on the price of $50.00 per acre, there never was an agreement as to the amount of land to be sold. As noted, Zamboni admitted that the Grahams had acquired some rights that he was willing to protect, and it then was the court's problem to determine what those rights were and to enforce them."

The judgment is affirmed.

MR. CHIEF JUSTICE MOORE, MR. JUSTICE KNAUSS and MR. JUSTICE HALL concurring.